Joanne CORNWELL and the American Hairbraiders and Natural Hair Care Association, on its own and on behalf of its members, Plaintiffs,

v.

Kathleen HAMILTON, Director of the Department of Consumer Affairs, et al., Defendants.

No. 97 CV 138–B (POR).

United States District Court, S.D. California.

Aug. 18, 1999.

Donna G. Matias, Clint Bolick, William Mellor, Miranda Perry, Washington, D.C., Richard Mark Segal, San Diego, CA, for plaintiffs.

Thomas S. Lazar, Richard D. Garske, Deputy Attorneys General, San Diego, CA, for defendants.

Robert S. Gerber, for amici, San Diego Urban League, Inc.

## ORDER GRANTING PLAINTIFF CORNWELL'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF AHNHA'S MOTION AND DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT; ORDER SETTING STATUS CONFERENCE

BREWSTER, Senior District Judge.

### I. Introduction

This case involves the question of whether, as applied, the State of California's Barbering and Cosmetology Act and implementing regulations violate Plaintiffs' Due Process and Equal Protection rights.

### II. Background

#### A. Plaintiffs' Claims

The causes of action legally relevant to these motions are Plaintiffs' claim that the cosmetology regulations as applied violate their Fifth Amendment Substantive Due Process rights as applied to the states by the Fourteenth Amendment and their Fourteenth Amendment Equal Protection rights. The Substantive Due Process claim—denial of the right to earn a livelihood—is self-explanatory;[1] the Equal Protection claim merits explication.

---

1. *See, e.g., Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Lebbos v. Judges of Superior Ct. of Santa Clara County,* 883 F.2d 810, 818 (9th Cir.1989).

Plaintiffs' Equal Protection claim is grounded on the reasoning that "sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).[2] Plaintiffs' claim is not that the Barbering and Cosmetology Act ("BCA" or "Act") is unconstitutional on its face.[3] As applied, the classification at issue is that the regulatory scheme treats persons performing different skills as if their professions were one and the same, i.e., it attempts to squeeze two professions into a single, identical mold.[4] The Equal Protection cause of action is properly before the Court.

**B. Statutory and Regulatory Environment**

**1. The Barbering and Cosmetology Act**

The BCA clearly covers Plaintiffs' activities.[5] The Act no longer mandates the minimum number of course hours required

to obtain a cosmetology license; instead, cosmetology schools must "maintain a course of practical training and technical instruction for the full cosmetology course as specified in this chapter and in board regulations." Cal.Bus. & Prof.Code § 7362.1(c). The statute expressly dictates that "[a] course of instruction in any branch of cosmetology shall be taught in a school of cosmetology." *Id.*

**2. Regulations**

Pursuant to Cal.Bus. & Prof.Code § 3212 part. II, the Department of Consumer Affairs ("DCA") is empowered to "[m]ake rules and regulations in aid or furtherance of [the Act]." The regulation setting forth the specific curriculum required in cosmetology courses is Cal.Code Regs. tit. 16, § 950.2. Section 950.2 lists seventeen mandatory subject categories in the cosmetology curriculum, as well as the minimum hours of technical instruction and/or practical operations that shall be devoted to each subject category.[6]

**2.** *See also* Lawrence H. Tribe, American Constitutional Law 1438 (2d ed. 1988) ("[E]quality can be denied when government fails to classify, with the result that its rules or programs do not distinguish between persons who, for equal protection purposes, should be regarded as differently situated. So it was with the majestic equality of French law, which Anatole France described as forbidding rich and poor alike to sleep under the bridges of Paris.").

**3.** Defendants' argument that Plaintiffs' challenge is a facial one is incorrect. Plaintiffs have consistently labeled their claim as an "as applied" one. Moreover, the doctrine of administrative exhaustion is not applicable. *See McCarthy v. Madigan*, 503 U.S. 140, 148, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 500–01, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Moreover, Plaintiffs need not wait until prosecution has been initiated when their injury is the inability to compete. *See Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

**4.** An illustration of Plaintiffs' argument would be if the State were to require that all professionals—be they budding architects, lawyers, or cosmetologists—attend a cosmetology training program. This statutory requirement

would treat all individuals in an equal manner. The constitutional violation would be in drawing the classification so broadly that the requirement for such a license is irrational because the professions are different.

**5.** Plaintiffs, at minimum, arrange, beautify, or otherwise treat by any means hair. *See* Cal. Bus. & Prof.Code § 7316(b)(1).

**6.** The Court has previously noted the relatively small percentage of the curriculum applicable to natural hair care.

Manicures, pedicures, eyebrow arching and removal, facials, makeup, hair coloring, bleaching, permanent waving, chemical straightening, chemicals, press and curl, haircutting, scalp and hair treatments, cosmetology chemistry, thermal styling, theory of electricity in cosmetology, and wet hair styling ... comprise 935 hours of the 1600 hour required curriculum.... The [California Board of Barbering and Cosmetology]—required curriculum contains 65 hours of instruction in health [and] safety, hazardous substances, bacteriology, anatomy, physiology, disinfection and sanitation. These 65 hours represent only four percent of the hours required for completion of cosmetology school.
*See Cornwell v. California Bd. of Barbering and Cosmetology, et al.*, 962 F.Supp. 1260,

## C. Role of the Court

■ With any case that calls into question the constitutionality of a statute and regulations issued by coordinate branches of government, albeit at the state and not the federal level, the Court stresses the limited role it plays in deciding such an action.[7] First, the Court starts with the presumption of the constitutional validity of a state law. *See Missouri v. Jenkins,* 515 U.S. 70, 112, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (O'Connor, J., concurring); *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 61, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J. concurring). Second, "[t]he Court does not address the issues whether California can require licenses for hairbraiders or whether they can require schooling and a licensing examination prior to allowing African hair stylists to perform their craft. These two issues are so clearly within the legislature's prerogative that the Court will not entertain challenges to them." *Cornwell,* 962 F.Supp. at 1272. Furthermore, the Court does not write laws for the State of California, nor does it mandate new regulatory programs. That is the role of the Legislature, and state agencies should the Legislature properly delegate such authority. The Court's only role is to decide whether the means used to regulate the activities in question are constitutionally permissible. Under the standard of review applicable to this case, that role demands deference and restraint. *See FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("This standard of review is a paradigm of judicial restraint.").

## III. Analysis

### A. Standard of Law

These motions are governed by the standards set forth in Fed.R.Civ.P. 56. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Standard of Review

#### 1. Strict Scrutiny

■ Strict scrutiny is not applicable to this case. The statute is not discriminatory on its face, nor do the Act and regulations as applied provide sufficient evidence of racial animus behind the statute. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[8]

Race, however, is not irrelevant to this case. Plaintiffs assert that African hair styling has distinct geographic, cultural, historical, and racial roots.[9] Plaintiffs also

---

1273 (S.D.Cal.1997). "The remaining hours are devoted to elective courses, some of which include communications skills, professional ethics, salesmanship, decorum, record keeping, and client-service record cards." *Id.* at 1273 n. 9. The parties agree that the list of relevant instruction categories is somewhat larger than that accepted for purposes of the motion to dismiss.

7. The State's legal position is a model of clarity—it equates hairbraiding with cosmetology, in both definition and with respect to its enforcement decisions. (*See* Thompson Decl. ¶ 4 with reference to the State's enforcement decisions.) Indeed, the Court feels compelled to issue this Order because, though the State requests a stay in deciding this matter, the State has communicated to the Court through counsel that it will not reciprocally and temporarily abate its enforcement efforts against hairbraiders pending a legislative resolution of this matter which Defendants claim is imminent.

8. "A facially neutral law ... warrants strict scrutiny only if it can be proved that the law was 'motivated by a racial purpose or object,' or if it is 'unexplainable on grounds other than race.'" *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1548–49, 143 L.Ed.2d 731 (1999) (citations omitted). The requisite degree of proof does not exist in this case.

9. *See generally* Bolick Opp'n Decl., Exs. 1–3; Ferrell Opp'n Decl. ¶ 3, Morrow Decl. ¶ 12 and Ex. C (pp. 14–21); Condon Dep., p. 44; *But see* Cornwell 8/12 Dep., p. 159.

contend that African hair styling is uniquely performed on hair that is physically different—alternatively described as tightly textured or coily hair—and that this physical difference is genetically determined to be in close correlation with race. Plaintiffs argue that society in general, and "mainstream" cosmetology as codified in law in particular, has ignored or denigrated these characteristics,[10] and that the State of California has embraced this ideology to such an extent that a large percentage of African–Americans have themselves adopted a construction of beauty which equates straight hair with attractiveness.[11] Defendants dispute Plaintiffs' characterizations of the origins of natural hair care, the racial distinctiveness of coily hair, and the racial uniqueness of natural hair care as to both provider and consumer. Despite these protestations, the Court accepts the high correlation between coily or textured hair and African–American descent as compared to other racial groups,[12] which accounts for the further high correlation between African–Americans and the particular art of African hair braiding and the use of hairbraiding services.[13] In light of this correlation, the Court notes the obvious racial impact present in the instant matter; however, purposeful discrimination based on race is not demonstrated to the extent necessary to support a strict scrutiny basis for the Court's decision in this case.

The Court finds, in any event, that application of the strict scrutiny standard is not necessary to resolve this case. *See Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (declining to reach heightened scrutiny in review of residency-based classifications that fail rational-basis test). In sum, strict scrutiny is not the appropriate standard of review.

**2. Rational Basis**

 The Court's review under both the Substantive Due Process and Equal Protection clauses is based on the rational basis test, i.e., the means employed by the State must be rationally related to a legitimate state interest. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124–25, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). A state can require high standards of qualification when regulating a profession but any qualification must have a rational connection with the applicant's fitness or capacity to engage in the chosen profession. *See Schware v. Bd. of Bar Examiners of New Mexico*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) ("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."). "In order to prove a substantive due process claim, [a plaintiff] must plead [and prove] that

**10.** Without so finding, the Court notes the evidence cited by Plaintiffs to support their argument. The State often refers to coily hair in a pejorative manner. *See, e.g.,* the State-approved textbooks; Manley Dep., pp. 32, 55, 109; Bolick Decl., ex. 12, 7/27/98 Final Exam, no. 45; Condon Dep., p. 104; Validation Report, Table 13.

**11.** Discussion of the adoption of straight hair styling by African–American women based on the negativity associated with African–American physical characteristics can be found in Cornwell Supp. Decl., Ex. A., pp. 30–31, 48–49, 52, 61–66. *See also* Bolick Decl., Vol. V., Exs. 13–20, ex. 15, Noliwe M. Rooks, Hair Raising: Beauty, Culture, and African American Women (Rutgers University Press), pp. 23–39; Ferrell Supp. Decl., ¶¶ 11, 13.

Defendants argue that such views on "institutional racism" are without evidentiary support and are mere personal belief, pointing out that there are many African–American women who prefer to have their hair straightened. Defendants argue that "no one is physically forcing them to go to the salon and have chemicals placed on their hair." (Defs.' Opp'n, p. 11.)

**12.** *See, e.g.,* Ferrell Decl., ¶ 5, Rasheed Dep., p. 39; Ferrell Opp'n Decl., ¶ 5.

**13.** *See, e.g.,* Ferrell Decl. ¶ 5, Rasheed Dep., p. 39. *See also* Condon Dep., p. 26, Manley Dep., p. 120. Obviously, the Act and regulations apply only to the persons performing the services, not to the clientele, where the correlation is extremely high. Anyone can train and work as an African hair braider.

the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " *Lebbos,* 883 F.2d at 818 (quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). The same standard applies with regard to the Equal Protection claim. *See City of Cleburne,* 473 U.S. at 439–40, 105 S.Ct. 3249.

Under the rational basis test, the "fit" required between legislative objectives and methods used to meet those objections is a loose one. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) ("Perfection in making the necessary classifications is neither possible nor necessary.") (citing *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); *Heller v. Doe,* 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.").

■ Still, while a perfect fit is not required, the fit must be reasonable. There must be some congruity between the means employed and the stated end or the test would be a nullity. The question is: given the State's inherent leeway, has the State regulated in a rational manner? For instance, to use a previous example, while the State of California has the undoubted latitude to define the practice and necessary skills of law and architecture, to re-

quire would-be lawyers and architects to take course work and pass a licensing exam in cosmetology would be irrational. There are limits to what the State may require before its dictates are deemed arbitrary and irrational. The Court turns to whether that line has been crossed.

## C. Application of Rational Basis Test

### 1. Legitimate Objective

■ The State's professed interest in the health and safety of its citizens is a legitimate one. Defendants, however, cite a veritable host of additional possible interests,[14] most of which are subject to criticism. Specifically, the interests stated assume the critical contention at issue—i.e., that natural hair care is part of the profession of cosmetology. If it is not, then these additional interests have, at most, tangential relevance to this case. This logic applies to the State's asserted interests in regulating the conduct of its professions,[15] in ensuring that applicants seeking to take the cosmetology examination meet certain threshold requirements; and in ensuring that applicants seeking to take the cosmetology examination not have demonstrated an unfitness—the double negative is Defendants'—to enter the profession. Indeed, this last interest works against the State in that forcing African hair braiders to attend cosmetology school logically impedes their ability to offer competent hairbraiding services to their customers, i.e., it leaves them untrained to perform their own craft.[16]

14. *See* Defs.' Mem. P. & A., pp. 32–39.

15. While a legitimate interest, the interest is not self-supporting; it logically must be related to the interest in protecting the health, safety, and welfare of a state's citizens. *See Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 434, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (holding that a state has "an extremely important interest" in regulating the attorneys' bar based on the "the ultimate objective" of " 'the protection of the public, the purification of the bar and the prevention of a re-occurrence.' ") (citation omitted).

16. Other interests asserted by the State, and subject to the same above-stated criticism in-

clude ensuring that persons seeking to engage in hair care activities receive adequate technical instruction and practical training in cosmetology hair care activities in approved cosmetology schools, and in ensuring that persons seeking to engage in cosmetology hair care activities also receive training in related non-hair care activities as well. However, concerns regarding viability and potential for success are grounded in cosmetology as the State has defined it—full-scale cosmetology services. If natural hair care consumers have their own desires, i.e., if the market is different than that expected by the State, this interest is irrelevant. (*See, e.g.,* Sylva Supp. Decl., ¶ 9.) More important, requiring natural hair care practitioners to

## 2. Means Utilized

### a. *Actual scope of Plaintiffs' activities*

The rationality of the State's licensing requirements is thus dependent on determining the range of Plaintiffs' activities. Plaintiffs contend that natural hair care is not cosmetology because practitioners engage in simple manipulation of hair. Plaintiffs define their profession as consisting of two simple elements: (1) twisting, braiding, or otherwise physically manipulating the hair (2) without the use of chemicals that alter the physical characteristics of the hair. (Pls.' Reply, p. 3.) When confronted with evidence that some would-be hairbraiders actually do some cosmetology-like activities, Plaintiffs contend that the overlap is both minimal and irrelevant.[17] Indeed, Plaintiffs argue that their use of cosmetology tools may appear similar on the face, but is in fact different—that heat is used differently, that combing non-relaxed coily hair is different than combing relaxed or straight hair, and that natural hairstylists merely snip hairs versus giving a "haircut." (*Id.* at 10–11.)

Defendants argue that Plaintiffs perform such a wide range of activities that they are indeed cosmetologists. "[Plaintiffs'] unlicensed hair care activities include shampooing hair, conditioning hair, cutting hair, hairstyling, applying heat to the hair, use of combs, clips, scissors, draping capes, hair oils, hair dryers, blow dryers, curling irons, synthetic hair extension, and cigarette lighters." (Defs.' Opp'n, p. 1–2; *see also* Defs.' Mem. P. & A., pp. 9–22, discussing each subject.) Defendants believe

that there is no "principled limit" to Plaintiffs' definition of natural hair care (Defs.' Opp'n at 6), and that they engage in a "whole host" of cosmetology activities (*id.* at 17). Defendants contend that Plaintiffs therefore must be labeled as cosmetologists and be subject to the full statutory and regulatory requirements. Plaintiffs respond that if certain individuals do cross the line and perform cosmetology tasks, they are not hairbraiders and are, of course, subject to California's licensure requirements.

The Court has thoroughly reviewed the depositions, declarations, and other exhibits submitted by the parties. The Court finds that the profession of natural hair care is a significant and legitimate branch of cosmetology, and that at least one individual meets the definition of natural hair care provided by Plaintiffs: Dr. Cornwell. No serious factual contentions exist with regard to Cornwell; what remains is merely legal argument as to what those facts imply.

Cornwell "locks" hair, a technique similar to hair braiding. Cornwell only locks coily hair. Indeed, non-coily hair will not hold a lock. Cornwell is admittedly deficient in knowledge of the physical and chemical structure of hair and anatomy, as well as disease recognition, sanitation, and hygiene. Cornwell only works with hair. She does not do facials, makeup, manicures, pedicures, or hair removal. She cuts hairs in terms of snipping stray hairs at the end of locks or parting matted locks or cutting off damaged hair, but she does

---

spend 1600 hours of their time at significant expense and/or opportunity cost learning irrelevant skills can hardly enhance their economic viability and potential for success. Indeed, if would-be braiders spend scarce money and time to get a cosmetology license, that individual may have few or no resources remaining to devote to the pursuit of his or her own craft. Finally, the overwhelming weight of the evidence shows that natural hair care practitioners do not provide face and nail care.

**17.** There is substantial evidence that some natural hairstylists do a range of tasks and

utilize many typical cosmetology/barbering instruments. Plaintiffs concede that "[t]he tools sometimes or commonly employed by natural hairstylists, depending on their techniques, may include combs, clips, scissors, draping capes, hair oils, blow dryers, curling irons, synthetic hair, shampoos, and conditioners. Most natural hairstylists ask their customers to come with their hair washed, but some will shampoo or condition their customers' hair. If they use scissors at all, natural hairstylists do so to clip stray hairs or to trim locks. They do not use scissors to style hair or to prepare hair for styling." (Pls.' Mem. P. & A., p. 13.)

not give haircuts or style hair in any other manner than that associated with locking. Her locking process involves a seven-to-ten hour session, with considerably shorter follow-up appointments to maintain the locks. Cornwell instructs on the use of heat on hair, but she does not use any heat implements, such as a curling iron, on hair. She may use a comb, and uses a "clip tool," an instrument of her own devising not found in mainstream cosmetology, and other "clips." She does not shampoo customers' hair, but admits that shampooing may be a part of the "Sisterlocks" process.[18] On the basis of this evidence, the Court finds that Cornwell's activities are minimal in scope compared to the activities of a cosmetologist. Because her activities are of such a distinguishable nature, she cannot reasonably be classified as a cosmetologist as it is defined and regulated presently.

Even if Cornwell were defined to be a cosmetologist, the licensing regimen would be irrational as applied to her because of her limited range of activities. This irrationality can be illustrated by analogy. Assume the range of every possible hair care act to involve tasks A through Z.

From the Court's perspective, Cornwell's activities would cover tasks A, B, and some of C.[19] The State's cosmetology program mandates instruction in tasks B through Z. The overlap areas are B and part of C. This minimal overlap is not sufficient to force Cornwell to attend a cosmetology school in order to be exposed to D through Z, when she only needs B and a portion of C. In sum, the Court finds that the Act as implemented through regulations is irrational when applied to Dr. Cornwell.[20]

The Court cannot say the same with regard to the unnamed members of AHN-HA. The problem with respect to these individuals is that the Court does not know who they are and what they do. The declarations and depositions of experts giving opinion testimony without sufficient factual foundation are of little assistance. The best "on-the-ground" observations are from the DCA's inspectors. The parties agree that there are a number of would-be hairbraiders who do a range of cosmetology-like tasks—heat treating hair, shampooing hair, singeing hair, etc.—or use a variety of cosmetology-like instruments—combs, curling irons, etc.—and do so with varying levels of sanitary practices.[21] For the purposes of summary judgment, the

**18.** While Defendants criticize Cornwell's marketing of her Sisterlocks Shampoo, the Court fails to see its relevance. Her marketing of her shampoo is a separate matter from her braiding activities. That is not an artificial distinction. No law exists in California that one must have any license involving chemical knowledge to sell shampoo.

**19.** To illustrate the analogy more completely, Category A could be hairbraiding, category B could be sanitation/bacteriology/anatomy/physiology, and category C could be theory of electricity and thermal hairstyling. A hairbraider may use heat in his or her practice, and so could reasonably be expected to be required to learn about this subject area even if the instruction encompassed matters not directly relevant to hairbraiding.

**20.** This finding of irrationality also rests on the other findings and reasons, *infra,* stated in this Order.

**21.** The evidence presented to the Court is the following, by category:

 1. *health and safety*

The weight of the evidence demonstrates that many self-proclaimed braiders are operating without proper use of health and safety procedures. (Reeves Decl. ¶ 6; Hicks Decl. ¶¶ 5, 7; Walker Decl. ¶¶ 4, 9; Jackson Decl. ¶¶ 12–14; Lauderdale Supp. Decl. ¶¶ 14, 24, 30.) Moreover, some individuals are causing harm to their customers in individual cases, (Kinney Supp. Decl. ¶ 16), or not delivering satisfactory results. (Walker Decl. ¶ 4; Hicks Decl. ¶ 10.)

 2. *use of chemicals*

Defendants are able to offer no instances in which a hairbraider uses hazardous chemicals. While Defendants would like to define the term "chemicals" to include all oils, creams, shampoos, etc., these products are not regulated by the State, are available over-the-counter, and are nowhere defined to be chemicals by statute or regulation. Moreover, the curriculum's focus is clearly on the hazardous chemicals inherent in straighteners, relaxers, and dyes. *See* Health and Safety for Hair Care and Beauty Professionals Fact Sheets (Bolick Decl., ex. 8.). Indeed, the evidence demonstrates that natural hair care providers affirmatively do not use chemicals. (*See, e.g.,* Sylva Dep., p. 49.) Defendants have

Court finds Plaintiffs' argument that they do these tasks/use these instruments in fundamentally different ways than mainstream cosmetologists is disputed.[22] In any event, they do not apply to Cornwell.

### b. *Irrationality as Applied to Cornwell*

#### i. *curriculum*

For purposes of summary judgment, Plaintiffs set forth their view of the minimum hours of instruction required for each area. (Compl. ¶ 22; Pls.' Mem. P. & A. p. 20) (defining "possibly relevant categories" as theory of electricity, thermal hairstyling, disinfection and sanitation, bacteriology, anatomy, and physiology

presented no evidence to suggest otherwise. Any individual who uses such chemicals is a cosmetologist.

#### 3. *cutting*

Defendants offer no proof that Plaintiffs "cut" hair in terms of giving a haircut as is commonly defined. The evidence demonstrates that while Plaintiffs may cut hairs, in terms of snipping off hairs at the end of a braid, or cutting through a matted lock in order to lock or relock hair, Plaintiffs do not cut hair as is commonly defined. (*See, e.g.,* Hicks Decl., ¶ 6 ("[The hairbraider] also used scissors and trimmed the hairs that were standing up from the braided hair."); Lauderdale Decl., ¶ 22; Kinney Supp. Decl. ¶ 14; Cornwell Decl. ¶¶ 9, 28.) Sometimes this cutting of hairs is limited to synthetic extensions. (Reece Supp. Decl. ¶ 11.)

#### 4. *shampooing*

While most African stylists request that customers come to a braiding session with their hair washed, some natural hair stylists shampoo customers' hair. (*See, e.g.,* Kinney Supp. Decl., ¶¶ 4, 8, 12; Rasheed Supp. Decl. ¶ 10.) Some other hairbraiders categorically do not shampoo customers' hair. (Reece Supp. Decl. ¶ 9.)

#### 5. *use of heat*

The use of heat may be a routine part of the craft of hairbraiding for some hairbraiders. This use may include blowdrying (Ferrell Dep., p. 244; Cornwell Dep., p. 240–41), the use of curling/crimping irons (Cornwell Dep., pp. 230–31), or cigarette lighters ("singeing"). (Sylva Dep., pp. 50–52; Ferrell Opp'n Decl., ¶ 8B ("braiders never singe human hair, but only the tips of synthetic fibers to seal the braids."); Lauderdale Supp. Decl. 26 (witnessing burning of synthetic hair).)

which "comprise 60 hours of technical (classroom) instruction and 50 hours of practical operations, for a total of 110 out of 1,600 mandated curriculum hours.") Plaintiffs acknowledge the need for education to perform their activities and admit to the potential need for regulation. What they dispute is the application of the current regulatory structure. Plaintiffs contend that if braiding is essentially not taught and not tested, the State's interest in the health of its consumers is minimally forwarded by forcing hair braiders to study avoidance of dangers in tasks that, according to Defendants' own expert, will not suffice to avoid that same danger when utilizing a different skill.[23]

**22.** Whereas Defendants claim these activities are sufficient to bring Plaintiffs within the vast umbrella of the definition of cosmetology in Bus. & Prof.Code § 7316, and that is the end of the legal story, such an argument is without merit. Defendants seem to contend that they need only show that some self-proclaimed hairbraiders in the State of California perform some cosmetology tasks in order to force all hairbraiders to meet the dictates of the Act and regulations. That is not the case. If any *individual* is acting as a cosmetologist, that person must have a license. However, if an *individual's* range of tasks is limited to physical manipulation of hair without the use of hazardous chemicals, the Act/regulations would appear irrational as applied to that individual.

**23.** Defendants' experts' views seem to be grounded more on ideology than facts. This ideology serves only to obfuscate the facts and makes the Court's determination more difficult. The Court discounts these opinions. For instance, Condon does not believe that it is possible to divide the profession of cosmetology, (Condon Dep., pp. 7–9, 19–20.), even though the State has done so with barbers and manicurists. Plaintiffs assert that "the existence of ... speciality licenses [e.g., for skin care, nail care, and electrolysis] establishes as a matter of law that cosmetology is not a unified profession whose discrete components cannot be separately practiced. If there is such 'a close relationship between non-hair care and hair care cosmetology activities' (Defs.' Opp'n, p. 21), wh[y] did the State create separate licenses? Indeed, why did it create separate licenses for barbers and cosmetologists, notwithstanding the far greater overlap between those two professions?" Condon does not answer this query. The Court finds the existence of these separate

There is no precise way to break the curriculum down into precise percentages of applicability versus non-applicability.[24] Previously, the Court found that only four percent of the curriculum to be relevant. For purposes of summary judgment, that percentage is somewhat higher, but well below ten percent. Defendants' item-by-item review of the curriculum [25] to support its argument that each and every part of the curriculum is relevant is unconvincing.[26]

The Court's review of the course curricula provided to the Court (*see* Bolick Supp. Decl., Vol. III, Exs. 9–10), course outlines from Defendants' experts' own courses, demonstrate that the curricula are of extremely marginal relevance to Plaintiff's activities. Exhibit 9 is a course outline from Ms. Condon's course at Riverside Community College, which is in turn broken down into a four-part series of courses. The Court's review of each segment of the course shows that a small number of overall hours are devoted to relevant subjects, and that braiding is minimally taught in this course.[27] The curriculum from Manley's Beauty Boutique, Inc./Poway Academy of Hair Design, Inc. (Ex. 10) is similar. The eight page outline breaks out the eighty-one page student handout package by activity. One page out of the eighty-one is devoted to braid-

licenses as relevant, if not determinative, to the question of rationality.

Ms. Condon also claims that Plaintiffs must offer a range of services including arching eyebrows, (*id.* at pp. 74, 78–79), makeup services (*id.* at pp. 75–76), bleaching services (*id.* at p. 76.), and even disputes Plaintiffs' opposition to chemical relaxers or straighteners. She refuses even to regard Cornwell as skilled. (*Id.* at pp. 33–34, 154.) Condon is joined in her views by Manley, who, for instance, offers unsupported views on the need to learn manicuring—supposedly because desired by the consumer. (Manley Dep., pp. 49–51.) Like Condon, Manley contends that African braiders do a full range of cosmetology services, either "just because" or because of unsubstantiated views that it helps to make a profitable living. (Manley Dep., pp. 79–87.) Likewise, Manley's defense of requiring instruction on facials, eyebrow arching and hair removal, makeup, and manicuring and pedicuring is without any factual support. (Manley Supp. Decl. ¶ 62 and ¶ 52 ("[T]he practice of cosmetology cannot be surgically divided in order to theoretically separate integrated hair care activities which are, both practically and professionally, inextricably intertwined.").)

24. The problem with doing a precise numerical analysis of the curriculum's content is how to account for the hours devoted to non-mandatory subjects. Title 16, Cal.Code Reg., section 950.2(c) states that "[t]he board *recommends* that schools provide training in the area of communication skills that includes professional ethics, salesmanship, decorum, record keeping, and client service record cards." (Emphasis added.)

25. *See generally* Manley Declaration; Condon Supp. Decl.

26. Defendants' argue that each item in the curriculum is relevant to Plaintiffs' activities. The Court disagrees. Take, for example, Manley's analysis regarding item no. 7, "wet hair styling." (Manley Decl. ¶¶ 36–41.) While the Court can see the potential relevance of a subcategory such as "hair analysis" (*id.* at ¶ 36), the Court does not agree with Manley's insistence that instruction on "fingerwaving" or "pin curling" has "many benefits" (*id.* at ¶ 40) and is "especially important" to Plaintiffs' activities. (*Id.*) Defendants' experts' do not differentiate their opinions of the curriculum's relevance even when referring to something that Plaintiffs categorically do not do. (*Id.* at ¶ 46 (permanent waving); ¶ 48–51 (chemical styling); ¶ 55–56 (haircoloring and bleaching); and even facials (¶ 59); (Condon Supp. Decl. ¶ 112–113).)

27. For instance, the only place braiding is included is in the "level II styling" category as the last of eight subcategories (52 total hours devoted to *all* eight subcategories). In comparison, the time devoted to facials, manicuring/pedicuring, and eyelash applications is seventy-two hours, or approximately ten times the amount of time given to braiding. In Course 60D, of the 288 laboratory hours, something in excess of ten hours appear relevant, assuming that the "styling over curly hair" means braiding and not chemical or heat-induced straightening, which the Court doubts, as braiding is not listed in the specific tasks supporting these hours. Again, the hours devoted to facials, makeup, and eyebrow arching overwhelm this relative paucity of hours which might be relevant. Course 60D is similar. The 330 hours in this course appear to be irrational as applied to hairbraiders.

666660

ing. In comparison, fifteen pages are devoted to manicuring, thirteen pages to chemical waving/straightening and haircoloring, and fourteen pages to skin care treatments. Four pages are devoted to safety and sanitation. Thus, just over six percent of the curriculum is relevant. Based on its review of these two curricula, the Court concludes that requiring a would-be African hair braider to attend a school of cosmetology is irrational and certainly unreasonable.

Nor does the availability of the "Pivot Point" curriculum save the regulations.[28] The Pivot Point curriculum is not included in approximately eighty-nine percent of the cosmetology school curricula in this state,[29] is not required by the Act,[30] and, being the exception to the rule, is evidence that the standard curriculum will not cover natural hairstyling while serving to underscore lack of training available in an overwhelming majority of cosmetology schools. Pivot Point does teach braiding—and twists, knots, overlaps, loops, and rolls—to some extent (twenty-one of the 120 pages are devoted to "braiding"), and to a far larger extent than the standard cosmetology school curriculum. But the course follows the mainstream cosmetology path in that it is focused primarily on the manipulation of straight hair.[31] While the "hair additions" component of this course appears to cover the subject of natural hair braiding, the Court finds the existence of this component not to undermine its view that the regulatory requirement is irrational when evaluated in light of all the other indicia of irrationality set forth in this Order. Furthermore, the hair additions course is supplementary to the main Pivot Point course.[32] More specifically, even if it were not supplementary, its presence (1) does not undermine the irrationality of forcing hair braiders to study nail care and other irrelevant subjects while exposing them to harmful chemicals; (2) is not direct training in Plaintiffs' recognized craft; and, most important, (3) if the entire 1600–hour curriculum is required, this requirement's irrationality would not be ameliorated even if the Pivot Point program were available throughout California's cosmetology schools.[33]

Defendants attempt to increase the percentage of applicable skills taught in the mandatory curriculum by arguing that many skills taught are transferrable or that cosmetology schools teach a wide range of "relevant" skills. Specifically, Defendants believe that the "finger wave" and/or the "pin curl," which form the "basis" of cosmetology, are transferrable to braiding. However, the finger wave techniques portrayed in the cosmetology texts are being performed exclusively on straight hair. Indeed, both of Defendants' experts concede that finger waving cannot

**28.** "Pivot Point" is a privately-owned educational company which owns schools and educational programming, the latter of which is available for lease or purchase by other cosmetology schools. *See* Rambert Decl. ¶ 3.

**29.** *See* Rambert Decl. ¶ 4. Pivot Point is utilized in seventeen out of approximately 150 schools, or approximately eleven percent.

**30.** *See* Aug. 5, 1998 Manley Dep., p. 52 ("Q. Is it the case that the state of California approves basic standard textbooks for cosmetology? A. Yes. ... Q. Is pivot point an approved textbook in California? A. No, not according to the program for barbering and cosmetology.").

**31.** The few African–American models in the photos have straightened hair, with the possible exception of one in the "long hair course," (Rambert Decl., Ex. A, p. 71), and approximately a dozen more in the "hair additions" course. Ironically, the photos included of African–American models are those with hair braided by Plaintiffs' expert, Pamela Ferrell, of Cornrows & Co. in Washington, D.C.

**32.** *See* Rambert Decl. ¶ 6 ("Designing Hair Additions ... is supplementary to the Pivot Point required curriculum but *not* mandatory for member schools to purchase or to provide to their students...."") (Emphasis in original.) Thus, it is unclear if this supplementary material is regularly taught even in the seventeen schools using the "Pivot Point" material.

**33.** *See, e.g.,* Ferrell Supp. Decl. ¶ 16 ("... most of the styles are for straight hair. It is not an adequate substitute for specialized training in natural hairstyling.").

be performed on "very curly hair or tightly textured hair."[34] Manipulative skills used in finger waves and pin curls are not the same as with braiding. (Ferrell Opp'n Decl. ¶ 10.) Moreover, instruction on how to avoid too much tension on hair and the scalp when braiding is not provided in cosmetology schools. Defendants' expert's contention that tension with respect to rollers is transferrable to braiding[35] is refuted both by Plaintiffs and by Defendants' other expert. (Manley Dep., pp. 37–38; Morrow Decl. ¶ 30; Ferrell Decl. ¶ 40.) Because finger waves and pin curls are not performed on coily hair, and the dexterity transferability between these cosmetology skills and braiding is dubious, Plaintiffs query, "how can two operations that cannot even be performed on black hair form the basis for all methods of styling that hair, and teach students the appropriate dexterity and manipulative skills?" (Pls.' Opp'n, pp. 19–20, n. 44.) The Court does not believe they can. The Court agrees with Plaintiffs' statement that there is "no guarantee that students who complete cosmetology school in California and take the licensing examination will learn the skills necessary to practice the craft of natural hairstyling." (Pls.' Opp'n, p. 17.)[36]

The Court notes other factors that point to the irrationality of the curriculum. First, even were it the case that a would-be braider might learn to braid in cosmetology school, there is no assurance that this would happen with every possibility of the reverse being true. That being the case, to become a braider, an individual must invest in additional schooling or an apprenticeship to learn his or her desired profession. Thus, the irrationality of the curriculum is heightened in that one is no longer speaking solely to what percentage of the curriculum hours is applicable, but addressing how many hours and dollars might be additionally necessary to teach skills that are required to braid professionally. For instance, if one needed an additional 200 hours of course/practical work to become a braider, a would-be braider is facing an 1800–hour curriculum versus the 1600–hour curriculum, a substantial burden.

Second, the current licensing regimen may work against the State's professed interest in health and safety. Because the licensing regimen requires would-be braiders to spend scarce time and resources on learning irrelevant skills, it actually impedes development of knowledge in their own craft. Thus, it aggravates the very harms the State seeks to avoid. For example, braiding hair too tightly may cause damage to the hair and scalp (inflammation, infection, or pustules, and even traction alopecia), but braiding, and its associated dangers, is essentially not taught in the standard cosmetology curriculum.[37]

34. *See* Condon Dep., pp. 63; Manley Dep., pp. 55–56.

35. *See* Condon Dep., pp. 51–52.

36. Bolick Decl., Ex. 16 ("As far as hair braiding, the schools have discretion as to whether they teach it, and not all schools do."); Sylva Support Decl. ¶ 12 ("I did not learn any braiding skills in cosmetology [school]. The school did not teach braiding, weaving, or extensions. The only techniques they taught for African-textured hair dealt with straightening the hair through pressing and chemical relaxing."), ¶¶ 13, 31; Reese Decl. ¶¶ 2, 15; Morrow Decl. ¶¶ 29–30.

37. "Q. Isn't it true that the lack of knowledge and information about proper hair care has resulted in some women going bald? A. Absolutely. And lack of knowledge. I would tell you that lack of knowledge has stemmed from cosmetology because you're not taught in the cosmetology school. And cosmetology—as a cosmetologist—as a licensed cosmetologist, they never taught me to recognize those things." (Ferrell Dep., p. 153.) (*See also* Manley Dep. 37–38: "Q. ... [I]s training to avoid traction alopecia with rollers interchangeable with training a student not to braid hair too tightly? In other words, if you just trained one as opposed to the other, would you feel confident that a student could avoid traction alopecia? A. Absolutely not.... Q. ... When you're testing students, if a student demonstrated that they could avoid traction alopecia with a roller, would you be satisfied without going any further that they could avoid traction alopecia in the hair braiding context? ... [W]ould one be an adequate substitute for the other? A. It would not in my schools.")

Third, the Court notes several salient points in the Joint Legislative Sunset Review Committee ("JLSC") Findings and Recommendations.[38] First, with regard to health and safety, the Report finds: "[P]ublic health and safety standards are secondary, since only 20 hours of the 1,600–hour required cosmetology curriculum must relate to disinfection and sanitation." (*Id.* at 41.) Likewise, the Report states: "Findings: There is some evidence provided that the unregulated practice of barbering and cosmetology could potentially endanger the health and safety of the public and cause significant public harm, but most of the precautions and procedures required or suggested by the board are for the safety and health of the professional not the client/customer." (*Id.* at 31.) Indeed, this finding is based on studies showing that long-term exposure by users of cosmetology chemicals may lead to higher incidence of miscarriages, birth defects, infertility, and upper respiratory problems and infections. (*Id.* at 32.) These findings are in line with Plaintiffs' arguments that forcing hairbraiders to take the 1600–hour course is to expose them to hazardous chemicals they do not use and otherwise would be able to avoid. (Pls.' Opp'n, pp. 21–22.) The Court finds that such mandatory exposure is irrational.

Moreover, the JLSC notes the rarity of occurrence of harm in actual practice on which the safety and sanitation provisions of the curriculum are focused. "Although use of chemicals, or lack of proper sanitary, disinfection, and sterilization procedures could cause injury to consumers, the *actual incidence of this problem appears to be extremely rare*.... [T]here is no evidence provided that even one case involving the spread of a parasite, or contracting AIDS or some other highly communicable disease, has occurred in a cosmetology salon or barbershop setting." (*Id.* at 34.) This lack of real life physical harm is reflected in the paucity of complaints regarding hairbraiding (*see* Perry Supp.

Decl. ¶ 7) and is admitted to by Defendants. (*See* Harrigan Dep., pp. 79, 104–05 (Bolick Supp. Decl., ex. 19).) Indeed, the Report sets forth the following: "Recommendation: It appears as though the Department should only continue with the licensing and regulation of those occupations which are involved in the use of potentially dangerous chemicals and procedures." (*Id.* at 31.) Based on this finding and recommendation, the Plaintiffs make the following argument: "The more general subsumes the more specific: if no justification exists for heavy licensing burdens for practitioners engaged in the extensive array of cosmetology services, even less justification exists for imposing the same excessive regime upon practitioners whose profession encompasses a fraction of the covered practices...." (Pls.' Reply, pp. 5–6.) The Court does not mean to minimize the potential harms inherent in disease exposure and excessive hair tension, and has already noted the lack of Plaintiffs' training regarding sanitary practices and/or knowledge. But requiring individuals to take a 1600–hour course in order to study a very few hours of sanitation and potential scalp disorder material when the threats which this information is meant to ward off are almost nonexistent is irrational.

Finally, the rationality of the required curriculum can be judged by comparing the 1600–required hours to other mandatory curricula in this State and other states. For instance, Plaintiffs note that Florida only requires that African hair braiders have sixteen training hours, focused on communicable diseases, sanitation and sterilization, scalp disorders and diseases, and knowledge of the cosmetology laws. Plaintiffs also compare the cosmetology regulations with the licensing requirements for emergency medical technicians—defined as providing advanced life support—who must complete only 1,032 hours of training. *See* Cal.Code Regs. tit. 22, § 100158. (Pls.' Mem. P. & A., p. 20 n.

---

**38.** Defendants request that the Court take judicial notice of this Report. Judicial notice is so taken.

22.) Other examples could include the training required for police officers and the regulation of tattoo parlors and practitioners.[39]

In sum, despite the claims that "braiding, locking, twisting, weaving, and cornrows [40] . . . are simply hairstyles which have been taught, and which continue to be taught, to cosmetology students in California as part of their cosmetology education," (Condon Supp. Decl., ¶ 46) the Court finds such an assertion to be incorrect. The mandated curriculum is not a rational exercise of licensure to the practice of Plaintiffs' desired profession.

### ii. textbooks

The Court has reviewed the four State-approved textbooks submitted by the parties [41] and concludes that African hair braiding could not be learned in a course utilizing any one of these texts.[42]

The Dalton text does not mention cornrowing or even braiding in the subject index. The section on "finger waving" is ten pages long and depicts Caucasian females with straight hair. In comparison, the section on nails is approximately thirty-two pages. In the West text, the section on "finger-waving" is seven pages in length, with depictions of a Caucasian model with short, straight hair. The section on "pin curls" is substantially the same. The book's sample exam questions ask when hair will fingerwave best. The answer is if it has "no curl." (*Id.* at Q/29 & A/2.) The terms "weave," "hair braiding," or "braiding" are not contained in the subject index. The textbook has one paragraph on "corn rowing," using as an illustration a model with straight hair. More important, this small paragraph is contained in the chapter on "hair pressing," thus implying that the author teaches cornrowing as a practice for straight hair. The author's observation about coily hair is telling:

> Most people with *overly-curly* hair have as many problems with their hair as

---

**39.** At oral argument, Plaintiffs stated that training for police officers in this State may be as little as 600 hours. With regard to tattooing, until recently, this activity has been unregulated except with regard to criminal provisions aimed at preventing tattooing of minors. Pursuant to Cal. Health & Safety Code § 119300 *et seq.*, a conference of local health officers has been tasked to develop sterilization, sanitation, and safety standards for this industry. Practitioners are now subject to inspection and registration. *Id.* at §§ 11903–04. Finally, a task force was due to provide legislative recommendations regarding further regulation. *Id.* at § 119308. However, the Court has been unable to discern whether these recommendations have been provided the Legislature. It does not appear, if so provided, that they have been acted upon. *See generally* Jeanine deGagne, "Tattoos and Body Piercing: Can Regulations Prevent Health Risks?," 29 McGeorge L.Rev. 695, 696–97 (1998).

**40.** "Cornrows" are small braids "created all over the head, often in a pre-planned design." Regents/Prentice Hall Textbook of Cosmetology 204 (Regents/Prentice Hall 3d ed.1993).

**41.** The textbooks referenced by the parties are all approved for use in California's cosmetology schools. Defendants submitted Milady's Standard: Textbook of Cosmetology Revised

(Milady Publishing Co.1995). Plaintiffs submitted three additional texts: Jerry J. Ahern, West's Textbook of Cosmetology (West 2d ed.1986); Mary Healy, Regents/Prentice Hall Textbook of Cosmetology (Regents/Prentice Hall 3d ed.1993); John W. Dalton, The Professional Cosmetologist (West 3d ed.1985). Defendants' expert Condon acknowledges that cosmetology schools in California use approved textbooks as their basic text(s). (Condon Dep., p. 55.)

**42.** Plaintiffs make the following statement: "Within well over 2000 combined pages, [Plaintiffs' expert] Ferrell found multiple chapters dealing with chemical straightening, but could find fewer than two dozen pages total dealing with braiding or extensions, and none discussing locking. Most of the textbooks do not even list the terms 'braid,' 'cornrow,' or 'extension' in their indexes. Two of the books used blonde models to illustrate braiding (in this case 'French braiding,' which is suitable for straight hair). One devoted two pages to 'cutting overly curly hair,' but used three models with straightened hair." (Pls.' Mem. P. & A., p. 26; *see also* Pls.' Opp'n, p. 15 n. 37.) The Court's own review of these textbooks confirms this statement.

people with straight hair. The most common problem is being limited to the types and number of styl~ that can be done. Hair that is *overly-curly* is often difficult to style because of the curl. For this reason hair pressing was developed. Hair pressing, also called silking, is the art of temporarily straightening *overcurly* hair.

*Id.* at 220 (emphasis added).

In the Regents/Prentice Hall text, the subsections on "finger waving" and "pin curls" are ten pages in total length, and are placed within the chapter on "wet hairstyling." While depicting one African–American model, among pictures of a Caucasian mannequin, that model appears to have straightened hair. While the text does reference braiding in its subject index, the subsection is less than two pages in total length and depicts a braid being performed on blond, straight hair. Similarly, the section on weaving and extensions is less than two pages in length, with an illustration of a Caucasian model. The Milady textbook follows the pattern of those textbooks described above. The textbook contains a section on braiding, but again the model is Caucasian with blond, straight hair. One paragraph and a preparation chart are devoted to cornrowing "overly curly hair," though the illustration is of a model with straightened hair.

Plaintiffs state that "the approved textbooks exhibit a gaping paucity of consideration of natural hairstyling or the unique characteristics of coily hair, except in the context of chemical straightening and relaxing." (Pls.' Mem. P. & A., p. 26.) The Court agrees. In sum, the state-sponsored textbooks used in California's cosmetology schools demonstrate the irrationality of requiring Plaintiffs to participate in this curriculum in order to be able to practice their profession.

### iii. licensing examination

The licensing examination which all applicants must pass is equally irrelevant to Plaintiffs' craft. The examination is divided into two sections: a written part and a practical part.

The written part is worth 100 points out of the total 400 total examination points. The Court has reviewed the Parties' stipulation regarding the contents of this mandated examination. (Bolick Decl., Ex. 5.) Under the "Cosmetology Content Area & Examination Plan," the Court views only the following subjects as applicable to natural hair care: sanitation, anatomy & physiology, electricity, and general chemistry. The combined weight given to these subjects is eleven points out of 100. In contrast, the weight given to the category of "chemical hair care" is forty-eight points out of 100, with permanent waving by itself worth eleven points, or equal to the above-noted relevant categories. The combined weight of the additional irrelevant categories of skin and nail care—sixteen points— is greater than relevant categories by approximately fifty percent. The irrelevant portions of the exam comprise eighty-nine percent of the written test.[43]

Defendants have submitted a lengthy "Validation Report" prepared by The Office of Examination Resources, California DCA, which reviews the written and practical portions of the examination given for cosmetologists in this state.[44] The Vali-

---

**43.** The Court has reviewed the exams submitted by Plaintiffs. (Bolick Decl., ex. 12.) Assuming that these practice exams approximate the licensing examination, the Court has randomly selected two of the exams for review. The July 27, 1998 freshman final exam contains 281 multiple-choice questions. Using the Plaintiffs' broad list of potentially relevant categories of instruction, the Court generously finds that approximately twenty-five of these questions—numbers 16–29, 196–198, 227–231, 268–69—or approximately nine percent are at least marginally relevant to the practice of African hair braiding. The July 27, 1998 final exam contains 395 questions. Approximately 101 of the questions—7–11, 89–90, 111–131, 178–79, 191, 195–200, 204–06, 210–224, 228–246, 271–274, 335–354, 380–82—or twenty-seven percent appear to have some relevancy to African hair braiding. However, neither exam even contains the terms "braiding" or "cornrows."

**44.** The Report appears to be a response to the criticisms in the JLSC: "Examination Process. 1. There is little evidence provides that a

dation Report purports to evaluate and validate the cosmetologist exams on the basis of "the job tasks that a licensed cosmetologist is expected to perform and the knowledge/skills a cosmetologist is expected to master at the time of licensure." *Id.* at 11. This body of knowledge/skill is contained in "task statements" and "associated knowledge/skill statements" set forth in Tables 3 and 4 of the exhibit.[45] The Validation Report sets forth nine "content areas" for the written examination and apportions a weight for each area based on "task critical values" and the number of tasks inherent in each. Of these nine— which range from "hair removal" to "permanent waving" to "haircutting, hairstyling, and treatments," two appear relevant to natural hair care: "safety and sanitation," and "hair braiding and weaving hair extensions." These two areas combined have a weight of thirty-seven percent out of a total of 100 percent, or thirty-three and four percent respectively. To put these weights in context, the category on "haircoloring, bleaching, and tinting" is given a weight of eighteen percent and "facials and facial makeup" and "manicure, artificial nails, and pedicure" carry a combined weight of five percent.

The Court perceives two fundamental flaws in this Validation Report. First, given the testimony and evidence that braiding is rarely if ever taught in cosmetology courses or tested,[46] hairbraiding probably does not deserves a category of its own. Second, the Report does not state whether the braiding in the study is of the type in the textbooks, i.e., performed largely on straight hair, or would include braiding of coily hair. Moreover, the task statements in this area are largely redundant. (*See, e.g.,* T39 and T42, T40 and T43.)

However, given that this area has a weight of only four percent, for the sake of argument the Court will ignore these problems. It does so because a review of the specific task statements in the "safety and sanitation" content area reveal an overwhelming number of statements that have no relevance whatsoever to Plaintiffs' activities, even if seen in their widest possible form. In particular, task statements 4–14 and 16–28 are for the most part safety and sanitation skills related to the use of chemicals. Thus, a total of only four out of twenty-eight tasks, or 1/7th, in the safety and sanitation context have any relevance to Plaintiffs' activities. In sum, upon close inspection, the validity of the written portion of the examination when applied to Plaintiffs' activities appears to be minuscule.

The Court now turns to the practical portion of the examination. The practical part is worth 300 of the total 400 available points, or seventy-five percent. The Board sets forth the scope of the practical part as the following:

> The examiner will observe and grade your ability to: give a patron a plain facial, apply makeup, arch eyebrows, wrap and saturate hair for a cold wave, straighten hair chemically and thermally, tint and bleach hair, give scalp manipulation, brush hair scientifically, cut

licensing examination is necessary for any of the seven licensing occupations. There has been no 'occupational analysis' performed on any of the examinations required by the board. There has been no formal validation study performed for the practical examination component. Thus, there is no indication that these examinations test the job-related knowledge, skills and abilities necessary to safely practice the specific profession." (*Id.* at 20) Likewise, the JLSC states: "[I]t is difficult to determine whether or not they are testing the appropriate knowledge, skills, and abilities necessary to practice in the cosmetology or barbering field." (*Id.* at 41.)

**45.** The Court is unsure from where these statements are derived; however, for the sake of argument, the Court assumes these statements to be reflective of the knowledge/skill necessary for a practicing cosmetologist.

**46.** *See* Condon Dep., p. 50 ("Q. You have stated that the precise technique of braiding, as opposed to shampooing and things like that, is not, to your knowledge, tested in terms of proficiency on the state cosmetology examination; is that correct? ... A. Yes.").

and shape hair, construct wet curls, fingerwave hair, set and style hair and comb out the finished coiffure, thermally style the hair using a hand dryer and curling iron, manicure nails, apply acrylic nails, tips and wraps.

The State's Validation Report also examines the practical examination. In comparison to the written examination, no "content area" of the seven given in this section pertains to hairbraiding—and it is not subsumed in the "haircutting, hairstyling and treatments" area—an implicit admission that hairbraiding is essentially not tested on the practical. Eighteen percent of the practical examination is weighted to "safety and sanitation." However, all three task statements in this category relate solely to chemical hairstyling—ex. "[a]pply patron protection to treatment areas before chemical hair straightening or relaxing service." Nothing in the practical portion directly tests the specialized skills required by African hairstylists. The testimony of Defendants' expert and Plaintiffs support this finding that the licensing examination does not specifically test braiding, locking, or extensions.[47] Not only

does the licensing examination not test braiding skills, it does not test specifically on characteristics of non-relaxed textured hair. (Condon Dep., p. 66.) Indeed, the licensing examination is so oriented to straight hair that a would-be licensee could not even pass the exam if he or she brought an African–American model without straightened hair to the practical portion of the examination to demonstrate his or her skills.[48]

Based on the above, the Court finds that the licensing examination as structured is not rationally related to the State's professed interests.[49]

### iv. Other indicia of irrationality

The Court notes that there are other grounds for finding the licensure requirements irrational as applied to Cornwell.

While not set out as specific legal claims, the Plaintiffs allege that "[t]he current cosmetology regulatory regime has the intent and effect of establishing and maintaining a cartel for cosmetology services with California." (Compl.¶ 91.) Plaintiffs argue that the regulatory regimen "effectuates through law the suppression of an emerg-

47. See Condon Dep., pp. 49–50, 52 ("A. Does the State Board ask the individual to do a braid per se? Not to my knowledge.... Q. You have stated the precise technique of braiding, as opposed to shampooing and things like that, is not, to your knowledge, tested in terms of proficiency on the state cosmetology examination; is that correct? ... A. Yes."). Though Defendants' expert insists that the examination is, in its entirety, highly relevant to African–American and/or highly textured hair—see, e.g., Condon Dep., pp. 59–60 & 66—that opinion seems rooted in the contention that the entire curriculum is relevant either in and of itself or as a means of teaching transferrable skills or that natural hair care practitioners must be doing more than they allege they do. That latter foundation being found to be unsupported and/or incorrect, the Court discounts this opinion. See also Sylva Decl. ¶ 14 ("When I took the cosmetology licensing examination, it did not test skills or knowledge relevant to what a braider must know in order to safely and competently braid hair.").

48. See Pls.' Mem. P. & A., p. 30; Pls' Opp'n, p. 18 n. 43; Ferrell Decl. ¶ 39; Manley Dep., pp. 54–56 (black model with coily hair would

have to have it relaxed) ("Q. So if a person chose an African American model, to use your term, with excessively curly hair, would the hair be relaxed at some point in order to make the model appropriate for the test? A. It is likely that it would be, yes. Because if the hair is highly textured or extremely curly, the finger waves won't stay in."), Condon Dep., p. 66.

49. Having found that the examination does not reflect Plaintiffs' practices, the Court notes that this legal conclusion is implicitly supported by the State of California. Indeed, the Validation Report, "Adherence to Legal Standards and Guidelines," states the following: "A number of federal and state statutes and guidelines, as well as case law, set the standards for the licensure, certification, and registration programs in California.... For a licensing program to meet these standards it must be based solidly upon the activities cosmetologists perform in practice." (February 19, 1999 Request for Judicial Notice, Ex. A, p. 9.) The "based solidly" requirement is not met in this instance.

ing industry by the dominant cosmetology industry." (Pls.' Mem. P. & A., p. 5.) This allegation is supported in the JLSC: "The coursework requirements translate into an extraordinary amount of money for the schools which offer them to the 'captive audience' would-be licensees. Most of these schools are for-profit enterprises, and profits are assured due to the state-required curricula and the availability of federal loans to students." (*Id.* at 18.)

Though not briefed by the parties, the Court notes that another section of the Act/regulations is irrational, i.e., the sections dealing with instructors' licensure and the actual teaching of hairbraiding. First, sections 7390 and 7391 of the Act mandate that to teach cosmetology, an additional 600 hours of training is required along with a thirty-hour continuing education requirement every two years. These hundreds of additional hours of training are not in braiding, but instruction in how to teach the required cosmetology curriculum. *See* Cal.Code Reg. § 950.7. Thus, for an individual desiring to teach braiding, an individual is forced to endure over 2200 approved course hours of predominantly chemical-focused and straight-hair styling, not to mention any other outside hours felt necessary to become proficient in the teaching of braiding. As noted by Plaintiffs, "[e]ven if Dr. Cornwell obtained a cosmetology license and an instructor's license in order to train others in the [S]isterlocks method, she would be unable to actually teach her [S]isterlocks method: the [BCA] has set forth its approved courses ... which contain no African hair styling.... Thus, Defendants' regulatory scheme makes it impossible for Dr. Cornwell to teach that which she would be technically licensed to do." (Compl.¶ 56.) Indeed, unless the Court

determined that Plaintiffs' hair care activities are not cosmetology at all, any teaching of their craft can only be taught in a school of cosmetology. Were the Court to support Defendants' position, and find hairbraiding to be cosmetology, but ignore the fact that hairbraiding is not taught in schools and the barriers to its teaching are unreasonably high, the natural result of this situation would be that the craft must die a slow death—all because the State has found hairbraiding to be cosmetology, but not to be an acceptable form of cosmetology for purposes of teaching or testing the skills involved.[50]

### IV. Conclusion

Defendants have misinterpreted Plaintiffs' case. "Through this lawsuit, AHN-HA seeks total exemption of its members from all cosmetology licensing requirements in California." (Defs.' Mem. P. & A., p. 2.) However, Plaintiffs do not seek a special "out" or preferential treatment; they seek rationality when trying to pursue a livelihood. Simply put, it is irrational to require Cornwell to comply with the regulatory framework. Even given due deference, the Act and regulations as applied to Cornwell fail to pass constitutional muster as they "rest[ ] on grounds wholly irrelevant to the achievement of the State's objectives." *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). As set forth, the basis of this Order is the finding that the State's mandated curriculum, on its face and upon review of its actual implementation and associated texts and exam, does not teach braiding while at the same time it requires hair braiders to learn too many irrelevant, and even potentially harmful, tasks. The vice is not the statute, but the implementing regulations.

---

**50.** Plaintiffs point to the logical inconsistency in Defendants' argument. "Defendants' arguments, in sum, are contradictory. They assert that African hairstylists need extensive training in order to prevent grievous harm. Yet they can point to virtually nothing in the mandatory curriculum, approved standard textbooks or actual training that relates specifically to the distinct training, skills, or tech-

niques necessary to be a competent African hairstylist. (¶) The mismatch between mandated cosmetology skills and specialized African hairstyling skills leads AHNHA's Taalib-Din Uqdah to query, 'How do you license what you don't teach? How do you teach what you don't know?' That is the central question defendants cannot answer." (Pls.' Mem. P. & A., p. 28.) The Court agrees.

If an individual does more than braid—if he or she routinely shampoos or cuts or dyes hair, or uses chemicals at all—they are not a hairbraider. If they do such activities, they are subject to the Act and regulations. Nothing prohibits the State from defining natural hair care and its boundaries or establishing a rational system of regulation. This Order merely prohibits Defendants from forcing Cornwell to take the State's mandated 1600–hour cosmetology course and to pass its licensing exam in order to practice her profession of African hair braiding, or to take an additional course to obtain an instructor's license in order to teach her craft to others.

After review of the pleadings and supporting documents, and for the reasons stated in this Order, Defendants' Cross–Motion for Summary Judgment is DENIED. Plaintiffs' Motion for Summary Judgment with respect to Plaintiff Cornwell is GRANTED; it is DENIED with respect to AHNHA. The Court ORDERS the remaining parties to appear before this Court on September 7, 1999 at 10:30 a.m. for a status conference to discuss how to proceed with Plaintiff AHNHA's claims.

IT IS SO ORDERED.