IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| SARA LADD, SAMANTHA HARRIS, AND POCONO MOUNTAIN VACATION PROPERTIES, LLC, | : : : : | No. 33 MAP 2018 Appeal from the Order of the Commonwealth Court at No. 321 MD 2017 dated June 4, 2018 sustaining in part and overruling in part the preliminary objections and dismissing with prejudice the Petition for Review. |
| Appellants | : : | |
| v. | : : : | |
| | : | ARGUED: September 11, 2019 |
| REAL ESTATE COMMISSION OF THE COMMONWEALTH OF PENNSYLVANIA AND DEPARTMENT OF STATE (BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS) OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : : : : : | |
| Appellees | : : | |

**OPINION**

JUSTICE DOUGHERTY                                    DECIDED: **May 19, 2020**

We consider the Commonwealth Court's holding that the broker licensing requirements codified in the Real Estate Licensing and Registration Act, 63 P.S. §§455.101-455.902 (RELRA), satisfy the heightened rational basis test articulated in *Gambone v. Commonwealth*, 101 A.2d 634 (Pa. 1954), and thus do not violate Article I, Section 1 of the Pennsylvania Constitution when applied to a self-described "short-term

vacation property manager."[1] We conclude the Commonwealth Court erred in so holding, and therefore reverse and remand for further proceedings pursuant to this opinion.

## I. Background

We begin by describing the relevant provisions of RELRA, which set forth the statutory licensing requirements for real estate brokers in Pennsylvania. Specifically, RELRA requires that any person engaged in the business of real estate, including those persons "acting in the capacity of a broker or salesperson," be "licensed or registered as provided in this act[.]" 63 P.S. §455.301. The statute defines a "broker" as:

Any person who, for another and for a fee, commission or other valuable consideration:

(1) negotiates with or aids any person in locating or obtaining for purchase, lease or an acquisition of interest in any real estate;

(2) negotiates the listing, sale, purchase, exchange, lease, time share and similarly designated interests, financing or option for any real estate;

(3) manages any real estate;

(4) represents himself to be a real estate consultant, counsellor, agent or finder;

(5) undertakes to promote the sale, exchange, purchase or rental of real estate: Provided, however, That this provision shall not include any person whose main business is that of advertising, promotion or public relations;

(5.1) undertakes to perform a comparative market analysis; or

(6) attempts to perform any of the above acts.

---

[1] Article I, Section 1 of the Pennsylvania Constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, §1.

63 P.S. §455.201. RELRA expressly exempts from this statutory definition of "broker" certain individuals who engage in the activities described in Section 455.201 and are therefore not required to obtain a broker license before providing the listed services. Notably, the statute exempts, *inter alia*, "[a]ny person employed by an owner of real estate for the purpose of managing or maintaining multifamily residential property[.]" 63 P.S. §455.304(10).[2]

RELRA requires real estate "brokers" to take an examination before becoming "licensed" to engage in any of the above-described activities in Pennsylvania. To be eligible to sit for the "broker's license examination," an individual is required to: (1) be 21 years-old; (2) have a high school degree or its equivalent; (3) "have completed 240 hours in real estate instruction in areas of study prescribed by the rules of the commission, which [ ] shall require instruction in the areas of fair housing and professional ethics[;]"[3] and (4) "have been engaged as a licensed real estate salesperson for at least three years or possess educational or experience qualifications which the commission deems to be the equivalent thereof." 63 P.S. §455.511(1)-(4). A real estate "salesperson" is separately defined as:

---

[2] Other exemptions include: owners of real estate with respect to their own property; employees of a public utility; employees of energy or mineral resource companies; attorneys pursuant to a power of attorney; a trustee; officer or director of a banking institution during certain transactions; cemetery companies; and auctioneers. 63 P.S. §455.304(1)-(11).

[3] The topics offered include: "Real Estate Law;" "Real Estate Finance;" "Real Estate Investment;" "Residential Property Management;" "Nonresidential Property Management;" "Real Estate Sales;" "Residential Construction;" "Valuation of Residential Property;" and "Valuation of Income-Producing Property." In addition, candidates for a broker's license are required to achieve credits from a "Commission-developed or approved real estate office management course;" and a "Commission developed or approved law course." 49 Pa. Code §35.271(b)(2)(i)-(ix).

Any person employed by a licensed real estate broker to perform comparative market analyses or to list for sale, sell or offer for sale, to buy or offer to buy or to negotiate the purchase or sale or exchange of real estate or to negotiate a loan on real estate or to lease or rent or offer to lease, rent or place for rent any real estate or collect or offer or attempt to collect rent for the use of real estate for or in [sic] behalf of such real estate broker.

63 P.S. §455.201. In addition, before becoming a real estate "salesperson" one must sit for an examination after satisfying these additional requirements: (1) be at least 18 years-old; (2) "complete[ ] 75 hours in real estate instruction in areas of study prescribed by the rules of the commission, which [ ] shall require instruction in the areas of fair housing and professional ethics[;]"[4] and (3) have a high school degree or its equivalent. 63 P.S. §455.521(1)-(3). After passing the salesperson examination an individual must apply to the Real Estate Commission (Commission) for a license and "submit a sworn statement by the broker with whom [the salesperson] desires to be affiliated certifying that the broker will actively supervise and train the applicant." 63 P.S. §455.522(a)-(b).

Only upon completion of the requisite three years as a real estate salesperson, and assuming the other three criteria in Section 455.511 are satisfied, may an individual sit for the broker's license examination. *See* 63 P.S. §455.511(1)-(4). Upon passing the examination, the individual must submit an application to the Commission indicating his or her place of business, 63 P.S. §455.512(a)-(b), and the newly licensed broker must thereafter "maintain a fixed office within this Commonwealth." 63 P.S. §455.601(a). Failure to comply with these licensing requirements before performing the services of a "broker" results in a summary offense and upon conviction a "fine not exceeding $500 or [ ] imprisonment, not exceeding three months, or both[.]" 63 P.S. §455.303. Moreover, a person who commits any "subsequent offense shall be guilty of a felony of the third

---

[4] The topics offered include: "Real Estate Fundamentals," "Real Estate Practice" and all acceptable basic real estate courses offered by accredited institutions. 49 Pa. Code §35.272(b)(2).

degree and upon conviction [ ], shall be sentenced to pay a fine of not less than $2,000 but not more than $5,000 or to imprisonment for not less than one year but not more than two years, or both." *Id.* Finally, the Commission is authorized to "levy a civil penalty [ ] up to $1,000" for practicing real estate without a license. 63 P.S. §455.305.

We now turn to the facts of the present case. Appellant Sara Ladd, a New Jersey resident, owns two vacation properties on Arrowhead Lake in Monroe County, Pennsylvania, an area commonly known as the Pocono Mountains. Petition for Review in the Nature of a Complaint for Declaratory and Injunctive Relief, 7/18/2017 at ¶¶15-18. Ladd started renting one of these properties in 2009 and the other in 2013 to supplement her income after being laid off from her job as a digital marketer. *Id.* at ¶¶17, 19. She used her digital marketing experience to establish an online system for booking the rentals. *Id.* at ¶20. Eventually, some of her Arrowhead Lake neighbors learned of her success and asked her to manage rental of their own properties. *Id.* at ¶21. By late 2013, Ladd formed a New Jersey limited liability company, Pocono Mountain Vacation Properties, LLC (PMVP), and in 2016, launched a corresponding website. *Id.* at ¶¶22-23. Her objective was to "take the hassle out of short-term vacation rentals by handling all of the marketing and logistics that property owners would otherwise have to coordinate themselves[.]" *Id.* at ¶25. Ladd considered "short-term" vacation rentals to be rentals for fewer than thirty days, and limited her services to such transactions only. *Id.* at ¶2 n.1.

Ladd acted as an "independent contractor" for her "clients" and entered into written agreements with them related to her services. *Id.* at ¶¶26-27. In these contracts, Ladd agreed to market her clients' properties on the internet;[5] respond to inquiries and coordinate bookings according to a list of pre-approved dates; manage all billing including

---

[5] In addition to marketing properties on her own PMVP website, Ladd also listed her clients' properties on Airbnb, HomeAway, Flip, Key, and VRBO. *Id.* at ¶27(b).

accepting rental payments and security deposits, subtracting her own commission, and remitting payments to her clients; and ensure the properties were cleaned between renters. *Id.* at ¶27. Her clients agreed to: execute a contract between themselves and the tenant; provide a list of available dates; work with Ladd to establish a rental rate; certify the property complied with all applicable laws; pay all applicable taxes;[6] maintain short-term rental liability insurance; provide a list of household rules and instructions; and ensure the property was stocked with necessary supplies and items in accordance with the website listing. *Id.* at ¶28. However, Ladd herself was never a party to the contracts between her clients and their renters. *Cf. id.* at ¶27.

Ladd managed PMVP alone and operated a majority of its business from her home in New Jersey. *Id.* at ¶40. According to Ladd, this limited overhead allowed her to provide low-cost services to her clients. *Id.* Her services involved rentals lasting only a few days at a time for just a few hundred dollars. *Id.* at ¶¶31-32. She never managed more than five clients' properties at one time and never managed a property outside of the Pocono Mountains. *Id.* at ¶33. She distinguishes her services from those of traditional real estate brokers who engage in "complex, months- or year-long transactions involving the transfer of permanent or long-term interests in real property" and generally "buy and sell houses worth tens or hundreds of thousands of dollars." *Id.* at ¶¶36-37. Ladd's services did not include buying or selling real property on behalf of her clients. *Id.* at ¶30.

In January 2017, the Commonwealth's Bureau of Occupational and Professional Affairs (the Bureau), charged with overseeing the Commission's enforcement of RELRA,

---

[6] Beginning in 2015, Ladd advised her clients they were required to comply with the Commonwealth's "hotel tax." *Id.* at ¶34, *citing* 72 P.S. §7210(a) ("an excise tax of six per cent of the rent upon every occupancy of a room or rooms in a hotel in this Commonwealth, which tax shall be collected by the operator from the occupant") and 61 Pa. Code §38.3 (defining "hotel" as any form of lodging "available to the public for periods of time less than 30 days").

called Ladd to inform her she had been reported for the "unlicensed practice of real estate." *Id.* at ¶60. Ladd reviewed RELRA and concluded her short-term vacation property management services were covered by the statute, and she would have to obtain a real estate broker license to continue operating PMVP. *Id.* at ¶¶61-62. As Ladd was sixty-one years old and unwilling to meet RELRA's licensing requirements, she shuttered PMVP to avoid the civil and criminal sanctions described in the statute. *Id.* at ¶67; *see also* 63 P.S. §§455.303, 455.305.

Ladd filed a complaint in the Commonwealth Court's original jurisdiction, seeking declaratory judgment and a permanent injunction.[7] Specifically, Ladd alleged RELRA's broker requirements and the Bureau's practices violate her substantive due process rights pursuant to Article I, Section 1 of the Pennsylvania Constitution because they impose unlawful burdens on her right to pursue her chosen occupation. *Ladd v. Real Estate Comm'n of Commonwealth*, 187 A.3d 1070, 1074 (Pa. Cmwlth. 2018). The Commonwealth filed preliminary objections in the nature of a demurrer,[8] challenging the legal sufficiency of Ladd's Article I, Section 1 claim, arguing the matter was not yet ripe and that Ladd had failed to exhaust statutory remedies.[9] *Id.* In response, Ladd argued the matter was ripe for judicial review because if relief were denied she would be subject to substantial hardships. *Id.* at 1075. She also argued she was not required to exhaust her administrative remedies because she was subject to "direct and immediate" effects

---

[7] Samantha Harris, one of Ladd's rental clients, and PMVP were also named plaintiffs in the lawsuit. Named defendants were the Commission and the Bureau (the Commonwealth).

[8] The Commonwealth defendants raised an additional preliminary objection claiming plaintiff Harris lacked standing. This objection was not decided by the Commonwealth Court and is not before us in this appeal.

[9] *See, e.g., Arsenal Coal Co. v. Dep't. of Envtl. Res.*, 477 A.2d 1333, 1338 (Pa. 1984) (plaintiff challenging agency's enforcement of regulation is generally required to exhaust statutorily defined administrative remedies before seeking equitable relief in court).

of Bureau enforcement. *Id.*, *citing Bayada Nurses, Inc. v. Dep't. of Labor & Industry*, 8 A.3d 866, 875-76 (Pa. 2010) (applying the exception announced in *Arsenal Coal Co. v. Dep't. of Envtl. Res.*, 477 A.2d 1333, 1339 (Pa. 1984) permitting pre-enforcement review when the effects of enforcement are sufficiently "direct and immediate") and *Pennsylvania Independent Oil & Gas Ass'n. v. Dep't. of Envtl. Protection*, 135 A.3d 1118, 1125-26 (Pa. Cmwlth. 2015) (same). Ladd further argued demurrer should be overruled because she was not required to prove the merits of her substantive due process claim at the pleadings stage and because RELRA, as applied to her, was unconstitutional pursuant to the heightened rational basis test applied in *Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003) (applying heightened rational basis test announced in *Gambone*, as discussed *infra*). *Id.* at 1075-77.

The Commonwealth Court first considered whether the matter was ripe for judicial review, or whether Ladd was first required to exhaust administrative remedies, noting that the principles behind both defense objections are distinct but they are often considered together when a party seeks pre-enforcement judicial review. *Id.* at 1076. The court then determined both doctrines were satisfied and pre-enforcement review was warranted because the effect off RELRA's licensing requirements on Ladd were sufficiently "direct and immediate" as she faced substantial criminal and civil sanctions for noncompliance pursuant to Sections 455.303 and 455.305 and a lengthy administrative process if she continued her business operations. *Id.*, *citing Arsenal Coal*, 477 A.2d at 1339. However, the court ultimately sustained the Commonwealth's demurrer and dismissed the complaint, holding RELRA's broker requirements are constitutional as applied to Ladd. *Id.* at 1078. In doing so, the panel applied the heightened rational basis test announced in *Gambone*.

The *Gambone* Court held a law restricting social and economic rights, like the right to pursue a lawful occupation, "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." 101 A.2d at 637. Applying *Gambone's* heightened rational basis test to the present factual scenario, the panel below concluded RELRA's licensing scheme as applied to Ladd was not unconstitutional. *Ladd*, 187 A.3d at 1077. The panel determined the purpose of RELRA's licensing requirement is "'to protect buyers and sellers of real estate, the most expensive item many persons ever buy or sell, from abuse by persons engaged in the business.'" *Id.* at 1077-78, *quoting Kalins v. State Real Estate Comm'n*, 500 A.2d 200, 203 (Pa. Cmwlth. 1985). Next, the panel observed professional licensing schemes are generally accepted across many professions to ensure competency, regardless of the number of hours worked or the number of clients. *Id.* at 1078 ("We would no sooner obviate the requirement for a professional engaging in the practice of real estate to hold a license than we would obviate the licensure requirement for an attorney, physical therapist, or any other professional, merely because they have limited clients or only practice part of the year."). The panel rejected the premise that "a license requirement becomes unreasonable or oppressive" for individuals who provide professional services "in a limited fashion," because it would "effectively upend the legitimacy of any requirement by the Commonwealth for a professional license." *Id.* The panel thus concluded "RELRA bears a real and substantial relationship to the interest in protecting from abuse buyers and sellers of real estate and is similar to licensing requirements in other fields." *Id.* The panel recognized RELRA's requirements would likely be "unduly burdensome" to Ladd due to the "small volume of real estate practice she conducted[,]" but "[t]he Pennsylvania Constitution . . . does not

require the General Assembly to establish a tiered system for every profession that it regulates" to account for such disparities. *Id.*

The panel also distinguished *Nixon*, *supra*, where this Court struck down as unconstitutional a statute prohibiting the employment of certain formerly convicted individuals in elderly care facilities because the prohibition was based on length of employment rather than individual rehabilitation efforts and thus lacked a real and substantial relation to the stated purpose of protecting facility residents. *Id.* at 1078-79, *citing Nixon*, 839 A.2d at 289-90. The panel determined RELRA did not impose a *Nixon*-like blanket ban excluding certain individuals from working in real estate, but simply "requires a real estate broker's license prior to engaging in the practice of real estate." *Id.* at 1079.

Ladd filed a direct appeal to this Court and we granted oral argument to determine:

[Whether] the Commonwealth Court fail[ed] to correctly apply the Pennsylvania rational-basis test, as set forth by this Court in *Gambone v. Commonwealth*, 101 A.2d 634, 636-37 (Pa. 1954), and its progeny, by[:]

1. Failing to hold an occupational-licensing scheme to the same "means-ends" review under Article I, Section 1 of the Pennsylvania Constitution that this Court has uniformly applied to all other restrictions on the right to pursue a chosen occupation?

2. Sustaining [the Commonwealth's] demurrer on the ground that, as applied to Appellant Ladd's vacation property management services, RELRA bore a "real and substantial relationship to the interest in protecting from abuse buyers and sellers of real estate," even though Appellant Ladd – who does not buy or sell real estate – credibly alleged that her services posed no such risk?

3. Sustaining [the Commonwealth's] demurrer without considering whether applying RELRA to Appellant Ladd's vacation property management services imposed burdens that were "unduly oppressive or patently beyond the necessities of the case[?]"

Appellant's Brief at 4. Our standard of review in this appeal from the Commonwealth Court's decision to sustain preliminary objections in the nature of a demurrer is *de novo*, and our scope of review is plenary. *Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 101 (Pa. 2008), *citing Luke v. Cataldi*, 932 A.2d 45, 49 n.3 (Pa. 2007). We recognize a demurrer is a preliminary objection to the legal sufficiency of a pleading and raises questions of law; we must therefore "accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts." *Id.*; *see also Yocum v. Commonwealth, Pa. Gaming Control Bd.*, 161 A.3d 228, 234 (Pa. 2017). A preliminary objection in the nature of a demurrer "should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted." *Id.*

## II. Arguments

Ladd begins by observing occupational restrictions must satisfy the *Gambone* heightened rational basis test — rather than the less stringent federal test discussed in *Shoul v. Commonwealth, Dep't of Transportation, Bureau of Driver Licensing*, 173 A.3d 669 (Pa. 2017) — because Article I, Section 1 of the Pennsylvania Constitution provides greater protections for occupational freedom than the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Appellant's Brief at 21-22, *citing Shoul*, 173 A.3d at 677 (recognizing Pennsylvania Constitution scrutinizes an exercise of police power more closely than its federal counterpart). Ladd admits the Commonwealth may exercise its police power by imposing restrictions on the right to pursue an honest trade to "protect the public health, safety, and welfare[,]" *see id.* at 26, *citing Nixon*, 839 A.2d at 286, but argues the power is not unrestricted and must satisfy both prongs of the *Gambone* test. *Id.* at 28, *citing Nixon*, 839 A.2d at 289. According to Ladd, the most important difference between the *Gambone* test and the federal rational

basis test is "'the degree of deference [each] affords to legislative judgment.'" *Id.* at 28-29, *quoting Shoul*, 173 A.3d at 677. Under the federal test, a statute restricting an economic liberty, like the right to earn a living, is presumed constitutional and a plaintiff is required to rebut every conceivable basis, whether or not it is in the record, to support the law. *Id.* at 29. However, when this Court applies the *Gambone* test, the Commonwealth's stated reason for enacting a given statute must be supported in the record or an objecting plaintiff may provide evidence to rebut that alleged reason. *Id.* at 29-30, *citing Warren v. City of Phila.*, 127 A.2d 703, 705 (Pa. 1956) (plaintiff can rebut presumption of constitutionality by producing sufficient evidence) and *Commonwealth ex rel. Woodside v. Sun Ray Drug Co.*, 116 A.2d 833 (Pa. 1955) (statute intended to protect public from mere "possibility" of being deceived is not sufficient to overcome challenge to statute as being unconstitutional and invalid exercise of police power).

Ladd argues the Commonwealth Court did not apply *Gambone* in a meaningful way in her case because it generally concluded, without consideration of her services, that application of RELRA's broker requirements bear a real and substantial relationship to the purpose of "protect[ing] buyers and sellers of real estate, the most expensive item many persons ever buy, or sell, from abuse," and because the panel never discussed whether the burdens imposed on her were "unduly burdensome or patently beyond the necessities of the case." *Id.* at 31-32, *citing Ladd*, 187 A.3d at 1077-78 (case involves a "'mere' licensing requirement[ ] [and those] are common 'across many career fields'" and that to distinguish her services "'would effectively upend the legitimacy of any requirement by the Commonwealth . . . for a professional license'"). Further, Ladd faults the panel for failing to understand that her services are unique and wholly different from a traditional real estate broker. *Id.* at 33 & n.24, *citing Ladd*, 187 A.3d at 1078 (licensing requirement not unreasonable or oppressive for individuals who provide regulated services in a

"limited fashion"); *id.* at 13-16 (arguing definition of "broker" is rooted in practice of real estate at time RELRA was enacted, which involved buying, selling, and leasing properties in large and often more permanent transactions). Although this Court never applied *Gambone* to a case exactly like Ladd's, she argues it is possible for her challenge to an occupational licensing law to succeed because other jurisdictions have applied similar tests to deem such laws unconstitutional. *Id.* at 34-35 n.25, 36-37 n.27 & n.28 (collecting cases). She emphasizes she alleged sufficient facts to show RELRA failed both prongs of the *Gambone* test or, at the very least, to survive a demurrer because it is not "'free and clear from doubt'" that RELRA, as applied, satisfies both prongs. *Id.* at 38-39, *quoting Mazur*, 961 A.2d at 101.

Regarding *Gambone's* mandate the law bear a "'real and substantial relation'" to a legitimate policy objective, Ladd alleges the government's stated interest is to protect buyers and sellers of homes. *Id.* at 39, *quoting Gambone*, 101 A.2d at 637. Ladd specifically argues none of RELRA's three broker requirements — the apprenticeship, instructional hours, or physical office space — bear a real and substantial relation to her services as a short-term vacation property manager because she does not assist individuals in buying or selling homes.

Ladd argues the apprenticeship requirement contains no objective measure of progress toward competency in short-term vacation property management, but instead would require her to work in an industry that provides totally different services; Ladd notes other jurisdictions have struck down apprenticeship requirements on similar grounds. *Id.* at 42-43 & n.30 (collecting cases). Ladd further argues the instructional requirements mandating hundreds of hours of coursework and passing two exams on real-estate practice do not bear a real and substantial relation to her ability to provide safe and quality short-term vacation property management services. She avers the courses required by

RELRA are broadly stated real-estate topics with no clear relation to her unique services. *Id.* at 48; *see also id.* at 47 (arguing even federal case law applying less restrictive rational basis test, *e.g.*, *Cornwell v Hamilton*, 80 F.Supp.2d 1101 (S.D. Cal. 1999), determined laws were unconstitutional on this basis). Finally, Ladd argues the brick and mortar office requirement is an archaic concept that bears no relation to her online, home-based business. Ladd asserts requiring her to maintain physical office space in Pennsylvania would not enhance the Commonwealth's ability to regulate, *see id.* at 50-51 (noting other real estate professionals regulated by RELRA are not subject to the brick and mortar requirement), nor does it have any impact on the competency of the services she provided.

Regarding *Gambone*'s directive that a reviewing court determine whether a statutory requirement is "'unreasonable, unduly oppressive or patently beyond the necessities of the case,'" Ladd argues the Commonwealth Court failed even to consider whether RELRA's broker requirements outweighed the government's purported policy objective when applied to her services. *Id.* at 52-53, *quoting Gambone*, 101 A.2d at 637. Ladd claims that, assuming *arguendo* RELRA's broker requirements have a "real and substantial relation" to the legislative goal, they are nevertheless unreasonable and unduly oppressive because those requirements still disproportionally burden her ability to earn a living and there are less drastic means of regulation available. *Id.* at 53, *citing Mahony v. Twp. of Hampton*, 651 A.2d 525, 528 (Pa. 1994) (applying *Gambone* to condemn economic regulation where "less drastic and intrusive alternative[s]" are available). Ladd argues the apprenticeship requirement is unduly oppressive because it places her ability to work at the discretion of licensed brokers and forces her to be financially subordinate to them for three years while forgoing her own business, when there are other less restrictive alternatives available. Ladd emphasizes less restrictive

alternatives already exist within RELRA for builder-owner salespersons, 63 P.S. §455.551, rental listing referral agents, 63 P.S. §455.561, and timeshare salespersons, 63 P.S. §455.591, and those jobs are more closely analogous to her vacation property management services than a real estate broker's services. *Id.* at 56.[10]

Next, Ladd asserts RELRA's instructional requirements are unnecessary — requiring that she spend hundreds of hours learning irrelevant material — and oppressive — requiring her to forgo three years of income to complete. Ladd insists she does not help clients buy or sell property, facilitate leases, or handle large sums of money and taking courses on how to perform those functions is irrelevant to her competent performance of a wholly different service. *Id.* at 61-63, *citing United Interchange, Inc. v. Spellacy*, 136 A.2d 801, 805-06 (Conn. 1957) (unnecessarily burdensome to subject individuals, who merely solicited homeowners to advertise their properties for sale in periodical, to Connecticut's most onerous real estate broker requirements despite falling within statute's definition of real estate broker) and *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 90 (Tex. 2015) (striking down educational requirements for eyebrow threaders because requiring completion of 750 hours of study to obtain a

---

[10] Ladd argues RELRA's severity is highlighted by the fact that hotel and apartment complex managers and travel agents, who provide services very similar to her own, are not subject to any form of licensure, *see* 63 P.S. §455.304(10), and are subject only to the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL). Appellant's Brief at 58-60, *citing* 73 P.S. §201-3.

Edward Joseph Timmons, Ph.D, who submitted an *amicus* brief in support of Ladd, suggests that, instead of licensing, short-term vacation property managers should be subject to a registration requirement, which is a less restrictive method of regulation. Timmons' Brief at 24. Timmons opines subjecting short-term vacation property management services to RELRA's onerous broker licensing regime will have negative implications for consumers because operating costs will increase and be passed on to them. *Id.* at 9, 14-16. Timmons further explains this is especially true when licensing requirements are not carefully crafted to fit the specific service they purport to regulate. *Id.* at 12-13.

cosmetology license, where only 430 hours or 52% of the coursework was relevant to their profession, was "not just unreasonable or harsh, but [] so oppressive" that it violated the Texas Constitution).[11]  Here too, Ladd argues, it would be oppressive to require her to spend three years, study hundreds of hours of unrelated materials, and forgo income to operate her limited business.  Finally, Ladd argues the brick and mortar office requirement is unduly oppressive because it is analogous to imposing an excessive fee on her right to work, *id*. at 63-64, *citing Olan Mills, Inc. v. City of Sharon*, 92 A.2d 222, 224 (Pa. 1952) (transient business license fee was unusual and unjustifiable extra expense imposed by the city), and the UTPCPL is available as a less restrictive alternative.

The Commonwealth responds that RELRA is constitutional as applied to Ladd because the General Assembly's intent was to protect the public when they buy or sell real estate regardless of the volume of work engaged in by a broker.  Appellee's Brief at 12.  The Commonwealth emphasizes the right to pursue a chosen occupation is not a fundamental right.  *Id*. at 13-14.  The Commonwealth agrees the *Gambone* test is applicable here, but stresses the General Assembly's laws are presumed constitutional and it need not present evidence to sustain the law's constitutionality.  *Id*. at 14-15, *citing Nixon*, 839 A.2d at 287 n.15.

The Commonwealth notes RELRA is designed to "'protect the public from abuse by those who are engaged in the business of trading real estate.'"  *Id*. at 15, *quoting Meyer v. Gwynedd Development Group, Inc.*, 756 A.2d 67, 69 n.2 (Pa. Super. 2000).  To that end, argues the Commonwealth, RELRA includes educational and apprenticeship

---

[11] Ashish Patel, the plaintiff in the Texas case, submitted an *amicus* brief on behalf of Ladd.  Patel analogizes this case to his own and argues RELRA's broker requirements, as applied to Ladd, fail the *Gambone* test because the sheer number of hours and costs imposed on Ladd to obtain a broker's license are unreasonable and unduly oppressive. Patel Brief at 16-18.

requirements to ensure brokers are adequately trained to provide quality services. *Id.*, *citing* 63 P.S. §§455.511, 455.521. The Commonwealth claims Ladd's personal burdens are irrelevant because these statutory requirements ensure the General Assembly's purpose of protecting the public is achieved regardless of the workload, age, or other unique burdens of a particular broker. *Id.* at 15-16. The Commonwealth asserts the lower court was correct when it concluded RELRA's broker requirements satisfied the *Gambone* test because accepting Ladd's argument that a licensing scheme becomes unreasonable or oppressive as applied to individuals who provide professional services in a limited fashion would effectively undermine the legitimacy of any professional licensing requirement. *Id.* at 16-17, *citing Ladd*, 187 A.3d at 1077-78.

The Commonwealth further argues the statutes involved in *Gambone* and *Nixon* were internally inconsistent and failed to further the General Assembly's respective purposes, in addition to creating an absolute prohibition on an individual's ability to engage in certain activities, whereas RELRA merely provides requirements for participation. *Id.* at 17-18, 20 n.11; *see, e.g.*, *Gambone*, 101 A.2d at 637 (limiting the size of signs showing the price of gas would not prevent fraud and larger, more visible signs might actually better prevent fraud and deception); *Nixon*, 839 A.2d at 281-82, 289-90 (statute arbitrarily and improperly distinguished between convicted individuals who worked at a covered facility for more or less than one year). Here, the Commonwealth asserts if an exception is created for Ladd's services then RELRA will be subject to the same internal inconsistencies that plagued the invalid statutes in *Gambone* and *Nixon* because the public will be protected when purchasing, selling or renting some real estate, but not when renting vacation properties. *Id.* at 18-19.

The Commonwealth warns that if the General Assembly is not permitted to set the minimum standards for real estate brokers it will likewise not be able to protect the public

from incompetent professionals in other fields. *Id.* at 19. It argues an exception for Ladd will create new due process rights for individuals who practice medicine without attending medical school, but intend not to perform major surgery, or architects who only design small houses, or pharmacists who only work weekends and do not prescribe narcotics. *Id.* The Commonwealth urges affirmance of the panel's decision because Ladd has not shown her due process rights were violated and the licensing requirements of RELRA are rationally related to the General Assembly's purpose of protecting the public. *Id.*

In a reply brief, Ladd argues the Commonwealth misconstrues the *Gambone* test as requiring only that a statute be internally consistent, when neither *Gambone* nor *Nixon* discussed consistency. Appellant's Reply Brief at 8. Ladd nevertheless asserts RELRA is internally inconsistent because certain individuals are totally exempt from its requirements, *see id.*, *citing* 63 P.S. §455.304(10) (multi-family dwelling manager), while others are eligible for licensure without completing the full panoply of RELRA's most onerous requirements. *Id.*, *citing* 63 P.S. §§455.551 (builder-owner salesperson), 455.561 (rental listing referral agent), 455.591 (time-share salesperson). Next, Ladd rejects the idea that application of the *Gambone* test here will diminish the legislature's ability to enact future regulations on other professions. *Id.* at 9. Ladd suggests the Commonwealth's position is based on the flawed premise that the right to earn a living is in direct conflict with the preservation of the Commonwealth's police power, but she notes the right to earn a living does not include the freedom to injure or defraud others, and that is when the police power should be exercised. *Id.* at 11, *citing Nixon*, 839 A.2d at 286. Ladd also stresses subjecting a licensing requirement to *Gambone* is not a guarantee that it will fail; to the contrary, she observes most existing licensing laws would satisfy the *Gambone* test, as they are properly related to public health, safety or welfare, unlike RELRA's requirements in this case. *Id.* at 11-13. Finally, Ladd emphasizes the

Commonwealth Court erroneously required her to prove her entire case at the pleadings stage, when *Nixon* and *Sun Ray Drug Co.* support further fact-finding related to the *Gambone* test. *Id.* at 23-24.[12]

### III. Analysis

Article I, Section 1 of the Pennsylvania Constitution provides "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art. I, §1. Our case law explains that, included within the right to possess property and pursue happiness, is the right to pursue a chosen occupation.[13] *See Nixon*, 839 A.2d at 288, *citing Adler v. Montefiore Hosp. Ass'n of Western Pa.*, 311 A.2d 634, 640-41 (Pa. 1973) and *Gambone*, 101 A.2d at 636-37. However, unlike the rights to privacy, marry, or procreate, the right to choose a particular occupation, although "undeniably important," is not fundamental. *Nixon*, 839 A.2d at 287. The right is not absolute and its exercise remains subject to the General Assembly's police powers, which it may exercise to preserve the public health, safety, and welfare. *Gambone*, 101 A.2d at 636. But, the General Assembly's police powers are also limited and subject to judicial review. *Id.*

---

[12] The Goldwater Institute, a nonpartisan public policy foundation, submitted an *amicus* brief on behalf of Ladd, taking the position *Gambone* applies and the Commonwealth Court erred because it effectively required Ladd to prove her constitutional claim on the merits at the pleadings stage. Goldwater Brief at 5-12.

[13] The Commonwealth argues because Ladd never had a real estate broker license it is not clear she ever had a property interest to support her present claim. Appellee's Brief at 13-14 n.9, *citing Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) ("after a license to practice a particular profession has been acquired, the licensed professional has a protected property right in the practice of that profession") (citation omitted). However, this Court has long recognized a right to pursue a lawful occupation and never held that right was dependent on licensure. *See Nixon*, 839 A.2d at 288, *citing Adler*, 311 A.2d at 640-41 and *Gambone*, 101 A.2d at 636-37.

A claim, like Ladd's, that a Pennsylvania statute violates substantive due process is subject to a "means-end review" where the court "weigh[s] the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize[s] the relationship between the law (the means) and that interest (the end)." *Nixon*, 839 A.2d at 286-87, *citing Adler*, 311 A.2d at 640-41. The level of scrutiny we apply to that means-end review is dependent upon the nature of the right allegedly infringed. When that right is fundamental, we apply strict scrutiny and will uphold the law only if it is narrowly tailored to achieve a compelling state interest. *Id*. at 287. A right that is not fundamental, however, is subject to rational basis review. *Id*. The rational basis test under Pennsylvania law is less deferential to the legislature than its federal counterpart. *Shoul*, 173 A.3d at 677.[14]

---

[14] The United States Supreme Court has explained the deferential nature of the federal rational basis test in the context of a challenge based on the Fourteenth Amendment's Equal Protection Clause:

> We many times have said . . . that rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices . . . [A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,

Pennsylvania's less deferential, "more restrictive" test,[15] provides:

> [A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts.

*Id.*, *quoting Gambone*, 101 A.2d at 636-37 (citation and footnotes omitted) and *citing Nixon*, 839 A.2d at 287 n.15 (recognizing "more restrictive" test). At this stage, we review the record to determine whether, accepting all well-plead facts as true, Ladd "clearly and without a doubt fail[ed] to state a claim for which relief may be granted." *Yocum*, 161 A.3d at 234. We accept as true Ladd's allegation that she is a short-term property manager where "short-term" is defined as a period less than thirty days. *See* Complaint at ¶2 n.1. Those services, as she defines them, *see id.* at ¶¶10-11, clearly fall within RELRA's

---

whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Shoul*, 173 A.3d at 677, *quoting Heller v. Doe*, 509 U.S. 312, 319-21 (citations and quotations omitted).

[15] Notwithstanding Justice Wecht's dissenting position that *Gambone* is not good law and should be overruled, *see* Dissenting Opinion, Wecht, J., slip op. at 1-8, both parties to this appeal agree the rational basis test articulated in *Gambone* and applied in *Nixon* and *Shoul* is the proper test in a substantive due process challenge to a statute that purportedly infringes on a non-fundamental right.

definition of real estate broker. *See* 63 P.S. §455.201 (defining a broker as any person who "manages any real estate" and any person who "undertakes to promote . . . rental of real estate").

Accordingly, we must determine: (1) whether RELRA's real estate broker licensing requirements — apprenticeship, instructional coursework and examinations, and brick and mortar location — are "'unreasonable, unduly oppressive, or patently beyond the necessities of the case[;]'" and (2) whether those requirements bear a "'real and substantial relation'" to the public interest they seek to advance when applied to Ladd under the circumstances alleged in her complaint. *Nixon*, 839 A.2d at 287, *quoting Gambone*, 101 A.2d at 637. We also recognize there is a strong presumption the statutory scheme is constitutional; the presumption may be rebutted only by proof the law clearly, palpably, and plainly violates the constitution. *Shoul*, 173 A.3d at 678, *citing Nixon*, 839 A.2d at 285-86. Our review reveals Ladd's complaint was sufficient to survive a demurrer and she alleged sufficient undisputed facts to raise a colorable claim that RELRA's broker licensing requirements are unconstitutional as applied to her.

Preliminarily, we reject the attempt by the panel below to limit *Gambone* and *Nixon* to legislation that acts as a "blanket ban" or "an absolute bar" on conduct; the panel erroneously distinguished the present case from those earlier decisions on the grounds RELRA does not completely prohibit certain conduct. *See Ladd*, 187 A.3d at 1079 ("Rather than a blanket ban on certain individuals from working as real estate brokers, RELRA merely requires a real estate broker's license prior to engaging in the practice of real estate."). It is true these earlier cases involved statutory prohibitions. *See Gambone*, 101 A.2d at 636 ("No sign or placard showing the price of liquid fuels sold or offered for sale or relating to price or prices, other than the signs or placards thus provided for, shall be posted or displayed on the premises . . . unless the signs . . . [are] similar . . . to the

sign . . . posted on the pump."); *Nixon*, 839 A.2d at 281 (prohibiting all individuals convicted of enumerated crimes from working at a covered facility if they did not work at that facility for one year prior). However, this particular factual detail is not dispositive as *Gambone* and its progeny nevertheless stand for the proposition that the General Assembly, when exercising its police powers to curtail a non-fundamental right, will be subject to a heightened rational basis review. *See Nixon*, 839 A.2d at 287-88 (recognizing the *Gambone* test is the appropriate test when a law restricts "undeniably important" rights); *Shoul*, 173 A.3d at 676-77 (same).

Applying *Gambone* here, we first consider the purpose behind RELRA's broker licensing requirements. The Commonwealth Court has held and Ladd argues the purpose of RELRA is "to protect buyers and sellers of real estate, the most expensive item many persons ever buy or sell, from abuse by persons engaged in the business." *Kalins*, 500 A.2d at 203. However, the Commonwealth argues the statute is more broadly intended to protect the public from fraudulent practices by those "'engaged in the business of trading real estate.'" Appellee's Brief at 15, *quoting Meyer*, 756 A.2d at 69 n.2. The General Assembly did not articulate a specific purpose for RELRA within its provisions; accordingly, we consider the origins of Pennsylvania law mandating licensure of real estate brokers to glean some insight. We conclude the Commonwealth correctly asserts RELRA was enacted to protect the public from fraud by those "engaged in the business of trading real estate." *Meyer*, 756 A.2d at 69 n.2.

We begin by observing RELRA's predecessor, The Real Estate Brokers' License Act of 1929, "comprehensive[ly] regulat[ed] [ ] the business of selling real estate for others" and defined "real estate broker" as including "all persons who, for another and for a fee. . . rent, or . . . negotiate the…rental" of real estate. *Verona v. Schenley Farms Co.*, 167 A. 317, 318-19 (Pa. 1933). The *Verona* Court determined the "obvious purpose of

the Act of 1929 [was] to prevent fraud and public wrong by correcting well recognized mischief" that existed at the time, including: "[c]ollecting rents without accounting for them; embezzling of down money; deceiving principal as to the identity of [the] buyer; acting as agent for both buyer and seller; [and] misrepresentation by salesm[e]n as to [the] rental of property[.]" *Id.* at 319-20 & n.1. It is thus clear the Act of 1929 was intended to regulate the practice of real estate as it existed during that time which consisted of both leasing and sales. RELRA built on that foundation and also expressly requires that individuals engaged in sales or rentals be licensed brokers. *See* 63 P.S. §455.201 (1), (2), (5) (including individuals engaged in leasing within the definition of "real estate broker"). The plain language of Section 455.201 (defining real estate broker) indicates the General Assembly intended RELRA to apply broadly, not just to buying and selling, but to all real estate transactions as they existed at the time of enactment. *See generally Allstate Life Ins. Co. v. Commonwealth*, 52 A.3d 1077, 1080 (Pa. 2012) (best indication of legislative intent is plain language of statute). And, as we have noted, Ladd herself concedes that her business operations fell within the RELRA definition of real estate broker. *See* Appellant's Brief at 9 ("Ms. Ladd was shocked that RELRA swept her novel services into the same category as traditional real-estate practice."). Thus, we conduct our *Gambone* analysis in light of the apparent legislative goal of protecting the public from the fraudulent conduct of those "engaged in the business of trading real estate." *Meyer*, 756 A.2d at 69 n.2.

As a preliminary matter, we recognize the government's legitimate interest in protecting consumers from fraudulent conduct by those "engaged in the business of trading real estate." *Id.* Whether the legislative goal is licensing individuals who assist with buying, selling or leasing properties, the Commonwealth clearly has a "strong interest" in regulating professions within its borders and the legislature has "broad

power[s]" to establish the standards that will achieve that end. *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 947 (Pa. 2004). Here, the General Assembly identified a bundle of services to describe the activities of a "broker" and imposed a series of requirements — apprenticeship, instructional coursework and examinations, and brick and mortar location — ostensibly designed to ensure individuals providing those services would not defraud the public. *See id.* at 948 ("[a] state may impose those professional requirements that it believes necessary to protect its citizenry"). The present appeal implicates Ladd's as-applied challenge rather than the proposition that the RELRA licensing scheme is properly aimed at a legitimate government purpose. *See Ladd*, 187 A.3d at 1078 (recognizing RELRA's requirements generally bear a real and substantial relation to the government's objective and are similar to requirements in other fields).

Accordingly, even if RELRA's broker licensing requirements generally bear a real and substantial relationship to protecting the public from the fraudulent practices of those "engaged in the business of trading of real estate," *Meyer*, 756 A.2d at 69 n.2, we must now proceed to consider their specific application to Ladd's actual business model: short-term vacation property management services. As we explain below, we conclude the Commonwealth Court erred when it sustained the Commonwealth's demurrer; Ladd's complaint raises a colorable claim that RELRA's requirements are unconstitutional as applied to her because they are, in that context, unreasonable, unduly oppressive and patently beyond the necessities of the case, *Gambone*, 101 A.2d at 637, thus outweighing the government's legitimate policy objective.

The issue is one of first impression for this Court, but decisions from other jurisdictions that have conducted a *Gambone*-like analysis in the context of occupational licensing requirements are instructive. In *Patel, supra*, the Texas Supreme Court struck down a statute that required eyebrow threaders to obtain a cosmetology license because

it violated the Due Course of Law provision of the Texas Constitution.[16] 469 S.W.3d at 90. The court applied a rational basis test similar to that set forth in *Gambone* to determine the regulation was unconstitutional as applied to these individuals, who perform a very specific, limited cosmetology service. *Id.* at 87 (requiring the court to determine "whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying government interest"). In doing so, the court considered how much of the total 750 hours of coursework, including practical training, required for cosmetology licensure was completely unrelated to the specific service of eyebrow threading and determined the licensing requirement imposed a significant cost that was an unduly burdensome means to achieve the government's health and sanitation end. *Id.* at 89-90.

The parties in *Patel* agreed that at least 320 hours or 42% of the coursework was unrelated to threading, and the court's analysis focused on the "quantitative aspect of the [instruction] hours represented by the percentage and the costs associated with them[.]" *Id.* at 89-90. The court determined the number of unrelated hours, though less than fifty percent of the total coursework required, was "highly relevant" to its analysis because of the significant quantity of time and cost associated with completing them. *Id.* at 90. Specifically, the court held the statute was "not just unreasonable or harsh, but it [was] so oppressive," and thus unconstitutional, because so much study time was not relevant while requiring expenditures of money as well as forgone employment. *Id.*; *see also Cornwell,* 80 F.Supp.2d at 1110-1111, 1113 (applying less restrictive federal rational basis test to conclude cosmetology statute was not rationally related to government's

---

[16] *See* TEX. CONST. art I, §19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

health and sanitation ends as applied to hair braider where "well below ten percent" of training hours were related to hair braiding).

Ladd is similarly faced with 315 hours of coursework (75 hours for her salesperson license and 240 for her broker license) in various topical areas that pertain to the work of traditional real estate brokers, but not to the services contemplated by her unique business model. *See supra* at nn.2-3. The only topics listed that are arguably related to her services are the general two-credit "Commission-developed or approved law course" and maximum four-credit "Real Estate Law" and "Residential Property Management" courses which satisfy at most 150 hours of the 315 hour requirement. *See* 49 Pa. Code §§35.271(2)(i), (iv), (4) (listing course topics and setting maximum of 4 credits per course); 35.201 (defining one "credit" as 15 hours of instruction). In other words, RELRA requires Ladd to complete 165 hours of coursework geared toward educating individuals about large scale transactions including buying, selling, and leasing residential and commercial real estate. Further, because the **broker** coursework cannot be completed until the **salesperson** coursework and apprenticeship are satisfied, Ladd's burden is substantially increased because she would have to forego her own PMVP profits for three years while she completes the licensure requirements. Applying this metric to the allegations of Ladd's complaint, taken as true, we conclude she has asserted a colorable claim that RELRA's instructional requirements, as applied to her, are an unreasonable and unduly oppressive means to achieve the statutory objective of protecting consumers from the fraudulent practices of those "engaged in the business of trading real estate." *Meyer*, 756 A.2d at 69 n.2.

Notably, the *Patel* court had before it coursework alone when it determined the statutory licensure requirements were unduly oppressive. *See also Cornwell*, 80 F.Supp. 2d at 1111 (statute irrational and unreasonable because so much of cosmetology

curriculum was not relevant to hair braiders). Here, RELRA imposes an apprenticeship and a brick and mortar office requirement in addition to an instructional coursework requirement, which obviously increases the economic burden.[17] Considering both the quantity of non-relevant hours and the cost of completing those hours, *see, e.g.*, *Patel,* 469 S.W.3d at 89, the three-year apprenticeship requirement would impose a substantial cost on Ladd; during that time she would ostensibly learn the traditional real estate trade, *e.g.*, completing transactions involving thousands, if not hundreds of thousands of dollars to buy, sell, or lease properties. But, this practical knowledge would be neither relevant nor directly applicable to a short-term vacation property management business involving rentals that last only a few days and cost only a few hundred dollars. *See* Complaint at ¶¶ 31-32. Adding to the equation the lost opportunity cost of shuttering PMVP during the apprenticeship, we conclude Ladd has stated a claim that the broker license requirements are unreasonable, unduly oppressive and patently beyond the necessities of the case. *Gambone*, 101 A.2d at 637.

Similarly, we conclude the brick and mortar office requirement, as applied to Ladd's self-described business model, appears to be disproportionate to the government's interest in safeguarding the public from fraudulent practices by those who "trad[e] in real estate." *Meyer*, 756 A.2d at 69 n.2. According to Ladd, she performed her professional services solely online from her home in New Jersey, *see* Complaint at ¶24, and a requirement that she obtain physical office space in Pennsylvania is tantamount to an excessive fee for entry into a profession. *See, e.g.*, *Olan Mills,* 92 A.2d at 223-24 ($200 license fee for transient businesses was "out of all reason too high" and unnecessary to

---

[17] Although the coursework requirements in *Patel* and *Cornwell* included both educational and practical components, while RELRA separates educational training, designated as instructional hours — from practical training — designated as an apprenticeship — the distinction makes no difference because the apprenticeship serves to teach the practical techniques of the trade.

protect the city from "unreliable fly-by-night operators"). The allegations of Ladd's complaint — taken as true — indicate her business model is sustainable only because she can provide quality services with limited overhead, *see* Complaint at ¶40, and requiring additional overhead, including rental or mortgage, taxes, insurance, and maintenance of a property does not further the statutory objectives of RELRA.[18]

---

[18] As the parties have not challenged the viability of the heightened rational basis test, Justice Wecht focuses on advocating for its application in an essentially toothless manner. *See* Dissenting Opinion, Wecht, J., slip op. at 11-14 (dismissing the importance of considering Ladd's self-described business model and the potential costs imposed on her when applying *Gambone*). However, in this as applied constitutional challenge, which is still at the preliminary objection stage, we must accept well-pleaded facts as true – specifically, we accept Ladd's description of how she conducts her business as a short-term vacation property manager. *See, e.g*, Complaint at ¶40 (alleging her business is sustainable only due to her limited overhead). The issue before us is whether the General Assembly exercised its police powers in an unconstitutional manner. *See Gambone*, 101 A.2d at 637 ("The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for **the courts**.") (emphasis added). Our analysis of this question would be incomplete without consideration of the opportunity and financial costs imposed on short-term vacation property managers by RELRA's coursework, apprenticeship, and brick and mortar requirements. *See, e.g.*, *Cornwell*, 80 F.Supp.2d at 1106 n.16 (applying the federal rational basis test; considering the economic and opportunity costs imposed on natural hair braiders by requiring them to obtain a cosmetology license and stating "if would-be braiders spend scarce money and time to get a cosmetology license, that individual may have few or no resources remaining to devote to the pursuit of his or her own craft"); *Patel*, 469 S.W.3d at 89-90 (applying *Gambone*-like test and considering costs imposed by excessive, unrelated coursework). Here, Ladd raises a colorable claim that the costs imposed on her when her short-term vacation property management services are swept into the definition of a traditional real estate broker render RELRA unconstitutional because those costs outweigh the Commonwealth's articulated anti-fraud objective. *See Nixon*, 839 A.2d at 286-87 (substantive due process challenge is subject to "means-end review" where the court "weigh[s] the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize[s] the relationship between the law (the means) and that interest (the end)"); *see also Gambone*, 101 A.2d at 637 ("Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.").

We find *Spellacy*, *supra*, to be persuasive. The Connecticut Supreme Court there considered the constitutionality of a statute regulating real estate brokers similar to RELRA. 136 A.2d at 803. The statute defined a "broker" as a person who "engag[es] in the real estate business," including listing for a fee the "sale, selling, exchanging, buying or renting [of] . . . real estate." *Id.* at 803. As a result, the *Spellacy* defendants, who did not engage in buying, selling, or leasing property, but simply solicited property owners to advertise in their periodical, were considered "brokers" operating without a license. *Id.* at 802. The court concluded the statutory requirements for broker licensure — a written examination, furnishing a corporate surety bond, and payment of substantial fees — were unconstitutionally burdensome as applied to the advertisers. *Id.* at 806. Obviously, *Spellacy* is not directly on point here because the advertiser defendants did not earn their fees by managing properties like Ladd. Nonetheless, the court's rationale that a real estate broker licensing scheme's most onerous requirements are unconstitutional when applied to individuals who do not provide traditional broker services is useful and relevant to our analysis.

We are further persuaded that it appears application of RELRA to Ladd is unconstitutional when we consider the fact that individuals who manage and facilitate rentals of lodging in apartment complexes and duplexes on behalf of their owners are completely exempt from the statute's broker licensing requirements, *see* 63 P.S. §455.304(10) (exempting "[a]ny person employed by an owner of real estate for the purpose of managing or maintaining multifamily residential property"), and those who manage and facilitate rentals in hotels do not fall under the terms of RELRA at all. It is clear Ladd's business model — as described in her complaint — is more closely analogous to the services provided by these exempt individuals than to those of a broker, despite the fact that the statutory definition of "broker" technically catches Ladd in its net.

Notably, Ladd routinely advised her clients they must comply with the Commonwealth's "hotel tax," 72 P.S. §7210(a) ("an excise tax of six per cent of the rent upon every occupancy of a room or rooms in a hotel"), where "hotel" is defined as any form of lodging "available to the public for periods of time less than 30 days." 61 Pa. Code §38.3. Ladd's "short-term vacation rental" clients were subject to the hotel tax because their contracts involved "transient" uses of property only. *See Slice of Life, LLC v. Hamilton Twnshp. Zoning Hearing Board*, 207 A.3d 886, 903 (Pa. 2019) (property made available for rent via home-sharing websites like Airbnb, "for a minimum of two nights and up to one week at a time" was used for "purely transient" purposes). Under the circumstances, Ladd asserts a colorable argument that it is unreasonable, unduly oppressive and patently beyond the necessities of the case, *Gambone*, 101 A.2d at 637, to exempt professions so closely analogous to her own while mandating her compliance with RELRA's onerous broker license requirements.

Indeed, it is these exemptions that remove from Ladd's challenge the specter raised by the Commonwealth, that is, a ruling in Ladd's favor will undermine all professional licensing schemes and subject them to challenges from individuals seeking tiered licensing regimes to practice their trade part-time or in limited subject areas.[19] *See*

---

[19] Justice Wecht believes we are creating a constitutional right to "a custom-made licensing statute" and proposes our holding is analogous to concluding "requirements for dentists are unconstitutional as applied to practitioners who only intend to extract teeth." Dissenting Opinion, Wecht, J., slip op. at 11-12. Respectfully, this tortured analogy misses the mark for two reasons. First, we do not hold an individual who engages in a profession, albeit in a limited fashion, cannot be subject to the broader regulatory scheme governing that profession. Instead, we conclude Ladd presents a colorable claim that as a short-term vacation property manager she is not engaged in the business of a real-estate broker because she provides different services – something like the distinction between a dental hygienist and dentist. And, contrary to Justice Mundy's reading, we do not view Ladd as a "limited fashion" real estate broker with a "smaller-scale business." Dissenting Opinion, Mundy, J., slip op. at 1. Second, and importantly, RELRA already excludes other "limited" broker-like professions – similar to Ladd's business model – from

*supra* at 18. In contrast to those hypothetical challenges, Ladd raises a colorable claim that RELRA's most onerous requirements are unreasonable, unduly oppressive, and patently beyond the necessities of her case, *Gambone*, 101 A.2d at 637, because there are clearly "less drastic and intrusive alternative[s]" already built into the licensing scheme. *Mahony*, 651 A.2d at 528.

Moreover, it is clear Ladd's business, as described in her complaint, would not operate without regulation and oversight in the absence of a broker license. *See e.g.*, *Spellacy*, 136 A.2d at 806 ("This is not to imply that [real-estate] activities such as the plaintiffs carry on cannot, consistently with constitutional limitations, be regulated."). Indeed, it appears her services would clearly fall under Pennsylvania's UTPCPL, as do the services of the RELRA-exempt hotel and apartment complex managers. *See* 73 P.S. §201-3 (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"). There is, therefore, a less drastic alternative to RELRA broker licensing that is not "unreasonable, unduly oppressive, or patently beyond the necessities of the case."[20] *Gambone*, 101 A.2d at 637; *see also* *Mahony*, 651 A.2d at 527-28 (concluding a zoning ordinance failed the *Gambone* test because "less drastic and intrusive alternatives" existed); *cf.* Timmons Brief at 12-13 (suggesting short-term vacation property managers should be subject to less restrictive registration requirement).

---

its onerous broker requirements, and thus, she asserts a colorable claim that pursuant to *Gambone* it is unreasonable to include her within them.

[20] The UTPCPL is an existing mechanism that regulates those who facilitate rentals in apartment complexes, duplexes, and hotels – services analogous to Ladd's short-term vacation property management services. When viewed in that light, at this stage of the proceedings, Ladd's claim that it is an unconstitutional exercise of the Commonwealth's police powers to subject her to RELRA's most onerous broker requirements while subjecting these other services to less intrusive alternatives has considerable force.

Finally, we reiterate that the Commonwealth's police power must be exercised in a constitutional manner, one that is not unreasonable, unduly oppressive, or patently beyond the necessities of the case, and bears a real and substantial relation to the purported policy objective. *Gambone*, 101 A.2d at 637. We conclude Ladd's allegations present a colorable claim that RELRA's requirements, as applied to her self-described services, are unreasonable, unduly oppressive and patently beyond the necessities of the case, and it is not clear and "without a doubt" those requirements bear a real and substantial relation to the statutory goal of protecting the public from fraud. *See Yocum*, 161 A.3d at 234 (demurrer "should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted"). Accordingly, we reverse the Commonwealth Court's order dismissing Ladd's complaint and remand for further proceedings consistent with this opinion.

Chief Justice Saylor, and Justice Baer, Todd and Donohue join the opinion.

Justice Wecht files a dissenting opinion.

Justice Mundy files a dissenting opinion.